VANDELEIGH INDUSTRIES, LLC a Delaware Limited Liability Company, Plaintiff Below Appellant,

v.

STORAGE PARTNERS OF KIRK-WOOD, LLC a Delaware Limited Liability Company and United Stor–All Centers, LLC a Delaware Limited Liability Company, Defendants Below Appellees.

No. 373,2005.

Supreme Court of Delaware.

Submitted: April 17, 2006.
Decided: June 2, 2006.

**92**

Thomas C. Marconi, Losco & Marconi, P.A., Wilmington, DE, for appellant.

Michael F. Bonkowski (argued) and David J. Falcone, Saul Ewing, L.L.P., Wilmington, DE, for appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, constituting the court en banc.

STEELE, Chief Justice:

In 2002, the defendant-appellee, Storage Partners, began construction of several improvements in an area on its own property that was subject to an easement for ingress and egress in favor of the adjoining property owner, Vandeleigh Industries, the plaintiff-appellant. Vandeleigh was not currently using the easement, nor did it have plans to do so in the future. Upon determining that Storage Partners planned to begin construction in the easement, Vandeleigh sought a preliminary injunction in the Court of Chancery to prevent Storage Partners from constructing the improvements. Finding no risk of imminent harm, the Vice Chancellor denied a preliminary injunction. On cross-motions for summary judgment, the Vice Chancellor determined that Vandeleigh had a valid easement for ingress and egress over a portion of Storage Partner's property and that the improvements were located within the easement. The Vice Chancellor, however, did not order Storage Partners to remove the improvements. Instead, after balancing the equities, the Vice Chancellor entered an Order that required Storage Partners to remove the improvements obstructing Vandeleigh's easement when Vandeleigh could demonstrate an imminent and viable use for the easement. Vandeleigh appeals from the Vice Chancellor's Order, claiming that the Vice Chancellor should have ordered Storage Partners to remove the obstructions altogether. We affirm, but remand to allow the Vice Chancellor to revise and clarify his Order in a manner consistent with this Opinion.

### FACT AND PROCEDURAL HISTORY

The plaintiff-appellant here, Vandeleigh Industries, LLC, owns the parcel of land and premises at 3730 Kirkwood Highway, Wilmington, Delaware. Vandeleigh currently operates a Rita's Water Ice franchise on that property. The first appellee-defendant, Storage Partners of Kirkwood, LLC, owns the land and premises at 3800 Kirkwood Highway. The second appellee-defendant, United Stor–All Centers, LLC, leases the Storage Partners' property and operates an eight-building self-storage facility thereon.[1]

The Vandeleigh property is approximately .25 acres in size and is bounded to the north by Kirkwood highway, which runs from west to east. The bulk of the Storage Partners' property, which is about 5.6 acres in size, is set back from Kirkwood Highway by about 653 feet. A nar-

---

1. We refer to the appellee-defendants collectively as "Storage Partners."

row strip of the Storage Partners' property (the "easement"), approximately 24 feet wide and 161 feet long totaling .88 acres, connects the rear portion of the Storage Partners' property to Kirkwood Highway. This narrow strip of the Storage Partners property adjoins the Vandeleigh property at the southern and western boundaries of the Vandeleigh property. Property that is owned by a third party, which is used to operate a Dunkin' Donuts, lies directly west and adjoins the narrow strip of the Storage Partners' property.

Vandeleigh took title to the Vandeleigh property in September 2000 from Kirk Partners, LLC. Except for the deed to Storage Partners from Storage Partners' immediate predecessor in title, every deed in the chain of title from Vandeleigh back to the original owner, and from Storage Partners back to the same original owner of the property, included a specific reference to a nonexclusive [2] easement for "ingress and egress" benefiting the Vandeleigh property and burdening the .88 acre strip of the Storage Partners' property.

In 2002, United Stor–All began construction of the eight-building self-storage facility it now operates on the Storage Partners' property. As part of the construction, United Stor–All installed a 155 linear foot mesa retaining wall that extends to approximately the centerline of the easement, and allowed the Dunkin' Donuts' Property to expand its parking lot within the easement. United Stor–All clearly knew of the easement's record existence, as the easement was shown on United Stor–All's development plan as an "ingress & egress easement" with specific reference to the deed identifying the source of the easement.

Before the Defendants began construction of the retaining wall or parking spaces in the easement area, Vandeleigh informed Storage Partners that it had rights in the easement, and that it objected to any interference with the easement. Jason Yancoski, Vandeleigh's president, contacted a Storage Partners' representative and requested that Storage Partners not interfere with Vandeleigh's rights in the easement. The Storage Partners' representative responded, in essence, that the easement no longer existed, or was otherwise invalid, and that Storage Partners would continue with their plan to build improvements in the easement area.[3]

On April 16, 2002, counsel for Vandeleigh sent a letter to counsel for Storage Partners requesting that Storage Partners enter into the "nondisturbance agreement" that was enclosed with the letter. The proposed nondisturbance agreement provided that Storage Partners would refrain from constructing the retaining wall or otherwise encroaching on the easement in exchange for Vandeleigh not filing suit

---

**2.** In this case, Vandeleigh concedes that "[t]he deed language in the chain of title creating the easement does not give Vandeleigh the exclusive use of the easement area."

**3.** The facts in this paragraph are drawn from the appellant's brief, in which appellant fails to cite to the record or appendix for support. The appellee's brief does not dispute these facts, but implies that the construction was complete before Vandeleigh took any action, noting: "As part of the construction, United Stor–All installed a … retaining wall in the Easement, and allowed the Dunkin Donuts Property to expand its parking lot within the Easement …., Shortly thereafter, on May 6, Vandeleigh filed its Complaint in the Court of Chancery, alleging that … the improvements deprived Vandeleigh of the use and benefit of the easement." The appellee did not cite to the record or to the appendix to support its version of the facts either. We have no reason to doubt that the interchange between Yancoski and the Storage Partners' representative actually occurred. In any event, these facts are not necessary to our holding in this case.

seeking a preliminary injunction or temporary restraining order. The purpose of the agreement was to preserve the *status quo ante* to enable the parties to attempt "to resolve their differences short of litigation." Storage Partners did not respond to the letter.

Having received no response, on May 6, 2002, Vandeleigh filed a complaint in the Court of Chancery seeking a declaratory judgment to determine whether Vandeleigh had rights in the easement; and, in the event that the Court determined that Vandeleigh had rights in the easement, seeking a preliminary and permanent injunction to prevent Storage Partners and United Stor–All from constructing the retaining wall or otherwise interfering with Vandeleigh's rights in the easement. On May 23, 2002, the Vice Chancellor held a conference call with the parties to address Vandeleigh's request for expedited treatment and a preliminary injunction. Counsel for Vandeleigh informed the Vice Chancellor that the only reason for the request for expedited treatment was that Storage Partners "may be in the process of constructing the wall" in the easement. Counsel also informed the Vice Chancellor that Vandeleigh was not currently using the easement. The Vice Chancellor denied the preliminary injunction because there was no risk of imminent harm to Vandeleigh.

Although the Vice Chancellor decided not to issue a preliminary injunction, he concluded that it made "perfect sense for [Vandeleigh] to have filed and ... to have sought expedited relief .... Nobody can accuse you of sleeping on [your rights] for an extended period of time." He also warned Storage Partners' counsel, that, "if you client goes forward with construction and I determine down the road that the construction was improperly done in the easement, then the value of that property goes up.... [I]f there is construction in that easement and it turns out that [Storage Partners] didn't have the right to construct in that easement, they're going forward at their own peril."

On January 2, 2003, Storage Partners filed a Motion for Summary judgment. Storage Partners primarily argued that the easement only granted pedestrian access from the Vandeleigh parcel to the adjacent Dunkin' Donuts parcel. Storage Partners also argued that, assuming the easement did grant vehicles the right to access the Vandeleigh property from Kirkwood Highway, that the goal of the easement was "impossible to accomplish." In support of this argument, Storage Partners presented an affidavit from Drew Boyce, a subdivision Engineer at DelDOT. Boyce stated that it was unlikely that DelDOT would approve a curb cut or entrance permit to connect the easement to Kirkwood Highway because of the close proximity that the curb cut would have to the Dunkin' Donuts' exit driveway. Boyce also stated that as of January 2003, Vandeleigh had not submitted an access application for DelDOT review.

On March 3, 2003, Vandeleigh filed a cross-motion for summary judgment arguing that the retaining wall and the parking spaces encroached upon the easement and should be removed, and that the defendants failed to show that the easement was extinguished or the purposes of the easement were "impossible to accomplish." At a summary judgment hearing on June 16, 2003, after hearing arguments from both sides, the Vice Chancellor granted Vandeleigh's motion for summary judgment and denied Storage Partners' motion for summary judgment. He concluded that the "ingress and egress" easement was a "means of access from the Vandeleigh parcel to the public road or to any other adjacent property.... [A]s a matter of law

... Vandeleigh holds an easement across the easement area. Such easement is not limited to pedestrian traffic, and it is available for vehicular traffic to the Kirkwood Highway." Having determined that Vandeleigh has a right to the easement, the Vice Chancellor then explored the appropriate remedy:

The record before me is not as clear as I would like it to be before I consider the question of whether the improvements ought to be removed. *On the one hand,* we have what I have ascertained to be Vandeleigh's vested property right. I couple that with Storage Partners conduct, which I think anyone reading the transcript of May 23, 2002 would conclude was a knowing, intentional, deliberate and considered decision to build this—what I'm saying, this was not an inadvertent act where the problem was discovered after the fact. I put that on one side of the scale.

*On the other side of the scale,* Vandeleigh really has no current use for this parcel.... I'm somewhat reluctant to remove something which has been built where there is no current harm whatsoever, as far as I can ascertain, to the plaintiff. Again, that may be too sharp a line I'm drawing in terms of no harm. But I think the parties have focused their energy and their efforts on who has what property right here, and I don't think they focused on what is the appropriate equitable remedy....

[I]t seems to me there are two choices at this point. One is that I order the improvements removed now.... Alternatively, I can say, "Leave them there until Vandeleigh has a reason to use the easement, and then take them down...." That may be six months from now. It may be never.

The Vice Chancellor then asked the parties to confer to determine whether there were additional facts he needed to inform his decision about the appropriate remedy and whether it was necessary to hold an evidentiary hearing.

During the months following the Summary Judgment Hearing, the parties exchanged correspondence with each other and with the Vice Chancellor in an effort to formulate an Order to resolve the dispute. On May 7, 2004, the parties and the Vice Chancellor held a teleconference to discuss the remedy. Counsel for Vandeleigh admitted that Vandeleigh had no plans to use the easement as of that point. Much of the discussion focused on the necessary regulatory steps Vandeleigh would have to take in order to make use of the easement, including getting an entrance permit from DelDOT and the possibility of re-subdividing the property. The Vice Chancellor concluded that the form order should "leave the improvements where they are, but to leave them subject to the rights of [Vandeleigh] to freely use that land when and if it's able to—when and if it would be able to use the lands but for the existence of the improvements." To justify this decision the Vice Chancellor reasoned:

In terms of the abatement, I'm just not certain I appreciate the wisdom of requiring land to be put to no use at all just so someone has a theoretical right which it simply cannot, as I understand, as a regulatory matter right now, make use of.

Because otherwise what would happen is that land would sit there fallow in perpetuity, I would assume, without any use being made of it by anybody, and I come back to the fact that we are talking about this is the land of the defendant.

On July 18, 2005, the Vice Chancellor issued an Order in this case. In his cover letter to counsel, the Vice Chancellor noted "in the absence of any use of the easement

area, it is my judgment that, *after balancing the equities*, the mandatory injunctive relief of removing the improvements, in the absence of a use for the easement area, would be imprudent."[4]  The Order stated:

2.  The Defendants have erected improvements within the area of the easement.

3.  The Defendants shall remove any improvements placed on the area of the Easement (and restore the lands to their condition prior to the erection of the improvements) upon the Plaintiff's demonstration of an imminent and viable use for the area of the Easement.  More specifically, upon the Plaintiff's obtaining all necessary regulatory approvals for the use of the area of the Easement for a proper purpose of the Easement, the Defendants shall promptly remove any improvements in the area of the Easement and restore the lands thereof to their condition prior to the erection of the improvements.  It is anticipated that the proper use of the Easement will be for vehicular access to and from the Kirkwood Highway.

4.  The Defendants shall not interfere with, or obstruct in any way, the Plaintiff's efforts to secure any and all necessary regulatory approvals for use of the easement.  The Plaintiff shall have full and exclusive authority to pursue review and approval for access to and from Kirkwood Highway over the area of the Easement from the appropriate governmental authorities, including the New Castle County Department of Land Use and the Delaware Department of Transportation.  All such reviews shall be conducted as if the improvements erected by the Defendants in the area of the Easement had not been constructed.

5.  The Defendants shall erect no additional improvements in the area of the Easement.

Vandeleigh appeals from this Order, claiming that the Vice Chancellor erred by not ordering the removal of all the encroachments constructed in the easement area.

## DISCUSSION

■  Vandeleigh argues that the Vice Chancellor erred as a matter of law by balancing the equities when entering the Order.  Relying primarily on *Richard Paul, Inc. v. Union Improv. Co.*,[5] Vandeleigh suggests that the Vice Chancellor simply lacked the authority to balance the equities in this case.  Whether or not the Vice Chancellor had the authority to balance the equities here is a question of law that we will review *de novo*.[6]

■  In this case, Storage Partners (the servient estateholders) owned the land subject to the Vandeleigh (the dominant estateholder) easement.  Generally speaking, the owners of a servient estate burdened by an easement in favor of a dominant estate may use the premises as they choose, but "may not interfere with the proper and reasonable use by the [owner of the dominant estate] of their dominant right."[7]  "To determine what

---

4.  Emphasis added.

5.  91 A.2d 49 (Del.1952).

6.  *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) ("Whether or not an equitable remedy exists or is applied using the correct standards is an issue of law and reviewed *de novo*.")

7.  *Copeland v. Jackson*, 683 A.2d 58, 1996 WL 526163, **1, 1996 Del. Lexis 314, *3 (Del. 1996) (Order) (Berger, J.) (quoting *Edgell v. Divver*, 402 A.2d 395, 397 (Del.Ch.1979)).  *See Hackendorn v. Mahan*, 24 Del.Ch. 228, 234, 8 A.2d 794, 797 (Del.Ch.1939) (quoting *Reiver v. Voshell*, 18 Del.Ch. 260, 158 A. 366 (Del.Ch. 1932)) ("[N]othing passes as an incident to the grant of an easement but what is requisite of its fair enjoyment.  Notwithstanding such a

constitutes interference with one's reasonable use of an easement, the court must consider 'the purposes for which [the easement] was made, the nature and situation of the property subject to the easement and the manner in which it has been used and occupied.' " [8] The law that governs the relationship between the servient estate and the dominant estate adds a wrinkle to this case that was not present in *Richard Paul,* and that mandates a different outcome.

In *Richard Paul,* the plaintiff-lessee, Richard Paul, Inc., sought to compel the defendant-lessor, Union Improvement Company, to remove certain obstructions across an alley bounding two sides of the building Richard Paul leased from the Union.[9] In 1942, Richard Paul leased the building "together with an airway approximately twenty (20) feet surrounding said building. . . ." as a factory for the manufacture of certain items.[10] The "airway" was in fact a twenty-foot wide alley running along the southerly and easterly sides of the leased building, and forming a right angle at the southeastern corner of the building. The alley had exits with gates on both Walnut and Ninth Streets in Wilmington.[11] Throughout the term of its leases with Union, Richard Paul loaded its products at a loading platform on the south of the building, used parts of the alley for parking purposes, and used both the Ninth and Walnut Street entrances.[12] In November of 1951, Union decided to convert some of its property adjacent to the building leased to Richard Paul into a parking lot. As part of this project, Union covered the entire area of alleyway with macadam and enclosed the parking lot with a cyclone wire fence which extended across and closed the alley's outlet into Ninth Street. At the same time, Union erected a fourteen foot wire gate at the southeastern corner of the building, which barred entrance to Union's parking lot and to the easterly portion of the alley from that portion of the alley that led to the Walnut Street outlet.[13]

The Vice Chancellor entered an order requiring Union to remove the obstructions. Shortly thereafter, Union prayed for a modification of the Vice Chancellor's order, arguing that it imposed an undue hardship on Union without resulting in any material benefit to Richard Paul. Union suggested an alternative means of ingress and egress for Richard Paul through Union's parking lot.[14] After examining the

---

grant, there remains with the grantor the right of full dominion and use of the land, except so far as a limitation thereof is essential to the reasonable enjoyment of the easement granted. Since a private right of way carries with it by implication only such incidents as are necessary to its reasonable enjoyment, the grant of such a right, which is not exclusive in its terms, and which can be reasonably enjoyed without being exclusive, leaves in the grantor the right of user in common with the grantee.") *See* also Restatement (Third) of Property: Servitudes, § 4.9 (2000) ("[T]he holder of the servient estate is entitled to make any use of the servient estate that does not unreasonably interfere with enjoyment of the servitude.")

8.  *Copeland,* 1996 WL 526163 at **1, 1996 Del. Lexis 314 at*3–4 (quoting *Walton v. Pop-*

*los,* 32 Del.Ch. 292, 85 A.2d 75, 77 (Del.Ch. 1951)).

9.  *Richard Paul,* 91 A.2d at 51. For purposes of simplicity in this opinion we ignore the fact that Richard Paul actually leased the basement and first and second floors of Union's four-story building.

10.  *Id.*

11.  *Id.*

12.  *Id.* at 52.

13.  *Id.*

14.  *Id.* at 51

"relative hardships" and concluding that the defendant's proposed form of relief, "will result in less hardship to the defendant and will also be equally convenient to plaintiff,"[15] the Vice Chancellor entered a final judgment granting Richard Paul relief in the form that Union had suggested.[16] Richard Paul appealed.[17]

On appeal, we determined that the Vice Chancellor correctly concluded that Richard Paul had a right under its lease to the unobstructed use of the alley in its length and breadth in the manner and extent it had been using it since 1942. We then determined that the Vice Chancellor had erred in crafting his remedy. Richard Paul argued that the Vice Chancellor's Order "force[d] it to take something other than that to which it is entitled under its lease."[18] Union argued that "in the awarding of final relief a court of equity may always consider the relative hardships and advantages to the parties and frame its decree on the basis of them."[19] While we found that the record supported the Vice Chancellor's conclusion that the alternate means of access Union proposed would be as convenient to the Richard Paul, we nevertheless examined the question "to what extent the Court of Chancery may balance the equities, convenience and hardships when awarding final relief to a plaintiff whose legal rights are clear."[20] We explained that, "a court of equity . . . may not utilize [the] maxim [that he who seeks equity must do equity] to rewrite the plaintiff's legal rights, or to prevent a plaintiff from asserting those legal rights in a court of law."[21] We also noted that, "[c]onditions may not be imposed to deprive a plaintiff of his full legal rights unless they secure an equitable right belonging to the defendant, or unless they secure to the defendant some matter which the plaintiff is estopped to deny him."[22] Finding nothing in the record to support the conclusion that the defendant had an equitable right or that the plaintiff was estopped, we concluded that Richard Paul had established a clear violation of its rights under the lease without there being any counter-balancing equities in Union's favor.[23] Accordingly, we reversed and remanded for entry of a final judgment that Union must abate the obstructions to the alley.[24]

Relying on the very broad statement of the law found in *Richard Paul,* Vandeleigh contends that the Vice Chancellor should have ordered Storage Partners to remove the retaining wall. This reliance is misplaced because, as Vandeleigh put it in a letter to the Vice Chancellor, "[Vandeleigh] was not using the easement area at the time the improvements were constructed, and has no current plan to use the easement."[25] This crucial difference renders *Richard Paul* inapplicable. Here, unlike in *Richard Paul,* the Vice Chancellor's order did not force Vandeleigh to take something other than that to which it was legally entitled. Instead, as soon as Vandeleigh demonstrates an imminent and

---

15. *Id.* at 53.

16. *Id.* at 51.

17. *Id.*

18. *Id.* at 53.

19. *Id.*

20. *Id.* at 54.

21. *Id.* at 55.

22. *Id.* (citations omitted).

23. *Id.* at 55.

24. *Id.*

25. Letter from Vandeleigh's Counsel to Vice–Chancellor (Jun. 7, 2005), pg. 2.

viable use for the easement, Storage Partners will be required to remove the obstructions at its own expense. The Vice Chancellor's Order does not rewrite Vandeleigh's right to use the easement for ingress and egress, does not prevent Vandeleigh from asserting that right, nor does it deprive Vandeleigh of its full legal rights. None of the other cases Vandeleigh cites persuades us otherwise.

Vandeleigh cites *Renaissance Dev. Corp. v. Universal Props. Group, Inc.,*[26] and three cases cited therein, *Whitlock v. Hilander Foods,*[27] *Le Clerq v. Zaia,*[28] and *Tyler v. Haverhill,*[29] to support its argument that the Vice Chancellor was without authority to balance the equities in the case at bar. This authority is distinguishable. In *Renaissance,* the plaintiff and the defendant's predecessor in interest entered into an agreement for purposes of creating a cross-easement to allow common passage to and from a nearby road. The cross-easement for ingress and egress was located on adjoining strips of land owned by the parties and applied to their successor and assigns.[30] The plaintiff dedicated an approximately 275 foot long strip to the cross-easement to provide ingress, while the defendant's predecessor in interest dedicated an approximately 150 foot strip to provide egress.[31]

After purchasing the lot, the defendant began to develop the site to build a shopping center. In doing so, the defendant raised the overall level of the property and constructed a retaining wall to prevent the collapse of material used to fill lower areas of the property.[32] Importantly, "120 feet of the wall was on [the plaintiff's] property within the easement area."[33] The trial judge denied the plaintiff's petition for permanent injunctive relief noting, in part, that the defendant's retaining wall did not unreasonably interfere with the plaintiff's "servient tenement" and that such relief would cause "great hardship to defendants while providing little benefit to [the plaintiffs]."[34] To support her conclusion, the trial judge also noted that the "plaintiff is not presently utilizing the area and has only speculative, uncertain, and vague plans to do so in the future."[35] The plaintiffs appealed and the Rhode Island Supreme Court reversed.

On appeal, the plaintiffs argued that the defendants were committing a continuing trespass and that they were entitled to relief because "black-letter law mandates that injunctive relief be granted because defendants deliberately placed the retaining wall *on [plaintiff's] property* in the face of objection."[36] The Rhode Island Supreme Court noted the general rule that "when there is a continuing trespass *on an owner's land,* he or she is entitled to a mandatory injunction."[37] Applying the law, the court concluded "considering that defendants knowingly and deliberately encroached *on [plaintiff's] property,* and did so even after the encroachment was pro-

26. 821 A.2d 233 (R.I.2003)

27. 308 Ill.App.3d 456, 241 Ill.Dec. 847, 720 N.E.2d 302 (1999).

28. 28 Ill.App.3d 738, 328 N.E.2d 910 (1975).

29. 272 Mass. 313, 172 N.E. 342 (Mass.1930).

30. *Renaissance,* 821 A.2d at 234–235.

31. *Id.* at 235.

32. *Id.*

33. *Id.* at 235.

34. *Id.* at 236.

35. *Id.* at 237.

36. *Id.* (emphasis added).

37. *Id.* at 238 (emphasis added).

hibited by [plaintiffs], a balancing of the equities was not appropriate because the hardship to the defendants was self-inflicted." Moreover, "even if a balancing of the equities had been appropriate, the encroachment was more than de minimus *where [plaintiff's] access to the back portion of its lot was restricted* [and] the amount of land involved was approximately 250 square feet. . . ."[38]

*Renaissance* is distinguishable for two important reasons: (1) the defendant's encroachment was not only upon the cross-easement *but also* upon the plaintiff's land by as much as 250 square feet; and, (2) the encroachment restricted the plaintiff's access to the back portion of its lot. These facts are not present in the case at bar. Instead, as the Vice Chancellor noted, we must "come back to the fact that we are talking about . . . the land of the defendant." *Whitlock* and *Haverhill* are distinguishable for the same reason *Renaissance* is distinguishable: they both involved claims that the defendant encroached on the plaintiff's land in one way or the other.[39] Finally, *LeClerq* is distinguishable on its facts because there the easement had been used although "not . . . very frequently."[40] If Vandeleigh had produced some evidence that it either had used the easement, however infrequently, or had plans to use the easement in the future, the outcome here may very well have been different.[41] Similarly, the outcome may have been different if Vandeleigh had produced some evidence that the

retaining wall actually encroached on its property.

Because we do not find the plaintiff's cited authorities persuasive, we turn to the Restatement (Third) of Property: Servitudes, § 4.9 and to our own case law for guidance. Comment (b) to § 4.9 is entitled "Application of public policy favoring productive land use," and provides:

> In resolving conflicts among the parties to servitudes, the public policy favoring socially productive use of land generally leads to striking a balance that maximizes the aggregate utility of the servitude and the servient estate. Socially productive uses of land include . . . development for residential, commercial, recreational, and industrial uses. Aggregate utility is generally produced by interpreting an easement to strike a balance that maximizes its utility in serving the purpose intended while minimizing the impact on the servient estate. . . :

The Vice Chancellor did exactly what the Restatement suggests when he concluded:

> . . . I'm just not certain I appreciate the wisdom of requiring land to be put to no use at all just so someone has a theoretical right which it simply cannot, as I understand, as a regulatory matter right now, make use of. . . . Because otherwise what would happen is that land would sit there fallow in perpetuity, I would assume, without any use being made of it by anybody, and I come back

---

**38.** *Id.* at 239 (emphasis added).

**39.** *See Haverhill,* 272 Mass. at 314, 172 N.E. 342 ("The plaintiff and defendant own adjoining lands. . . . The defendant has constructed a heavy masonry wall upon what it contended was its own land. . . . A master . . . found that this wall in large part encroaches upon the land of the plaintiff."); *Whitlock,* 308 Ill. App.3d at 457, 241 Ill.Dec. 847, 720 N.E.2d 302 ("Recently, defendant built an addition to

the store. The south retaining wall of the addition is on defendant's property, but the underground footings of the wall encroach on plaintiff's property.")

**40.** *LeClerq,* 28 Ill.App.3d at 742, 328 N.E.2d 910.

**41.** *See e.g., Diefenderfer v. Forest Park Springs,* 599 So.2d 1309 (Fla.Dist.Ct.App.1992).

to the fact that we are talking about this is the land of the defendant.

Comment (c), which is entitled "Use by holder of servient estate" further supports the Vice Chancellor's decision in this case. It provides in part:

> The person who holds the land burdened by a servitude is entitled to make all uses of the land that are not prohibited by the servitude and that do not interfere unreasonably with the uses authorized by the easement.... An easement is a nonpossessory interest that carves out specific uses for the servitude beneficiary. All residual use rights remain in the possessory estate—the servient estate. The term "holder" is used interchangeably with "owner" to indicate that any possessor of an estate burdened by a servitude, whether the "owner" of a fee simple or a lesser estate, is entitled to use the servient estate in the manner specified.

\* \* \*

Questions sometimes arise as to the ability of the servient owner to locate improvements within the boundaries of an easement *when the improvement does not interfere with current uses of the easement.* Whether the improvement is an unreasonable interference with the servitude depends on the character of the improvement and the likelihood that it will make future development of the easement difficult. If the improvement is temporary and easily removed, it is generally not unreasonable. The more expensive the improvement or the more difficult its removal is likely to be, the more likely is the conclusion that the improvement is an unreasonable interference with the easement or profit.

The question whether the servient owner's use is an unreasonable interference with an easement or profit may be linked to the question whether the servitude beneficiary will lose rights authorized by the easement or profit if the servient-estate owner continues the use for the prescriptive period. Although the argument will often be circular—the beneficiary will lose rights by prescription if the use was an unreasonable interference by the servient owner, and will not lose rights if the use was not an unreasonable interference—any substantial risk that the servient owner's use will give rise to a later claim for termination by prescription is a sufficient basis for concluding that the use is an unreasonable interference.[42]

The Restatement, in part, mirrors Delaware law. As stated above, to determine what constitutes interference with the dominant owner's reasonable use of an easement we must consider "the purposes for which the [easement] was made, the nature and situation of the property subject to the easement and *the manner in which it has been used and occupied.*"[43]

In this case, the retaining wall Storage Partners installed within the boundaries of the easement clearly does not interfere with Vandeleigh's current use of the easement, because Vandeleigh *is not currently using the easement,* nor does it have plans to do so. Moreover, there is nothing in the record to suggest how easy or difficult it would be to remove Storage Partner's retaining wall, now or in the future. Nor is there anything in the record to suggest that the retaining wall will make future development of the easement difficult. Regardless of the ease or difficulty in removing the obstructions, the defendants

---

42. Restatement (Third) of Property: Servitudes, § 4.9 com. (c) (emphasis added).

43. *Copeland,* 1996 WL 526163 at \*\*1, 1996 Del. Lexis 314 at \*3–4 (emphasis added).

admit that "the lower court order made clear that the cost of removal would rest with the defendants, should removal ever become necessary." Considering the nature and situation of Storage Partner's property and the easement, that Vandeleigh *is not currently using* the easement and has *no plans to do so in the future*, that there is no evidence in the record to suggest how easy or difficult it would be to remove the improvements, and, given the provision of the Vice Chancellor's order requiring Storage Partners to remove the obstructions upon a demonstration of an imminent and viable use, we must conclude that the improvements do not interfere with Vandeleigh's reasonable use of the easement.

■ We will, however, consider the question of whether Storage Partners can or will acquire full fee simple title to the easement area by adverse possession. The admittedly circular question the Restatement uses as a proxy to determine whether the servient owner's use is an unreasonable interference with an easement—whether there is a "substantial risk that the servient owner's use will give rise to a later claim for termination by prescription"—is unhelpful in this case. The reason is that the record does not reflect the ease or difficulty in removing the retaining wall. In any event, there is no risk whatsoever that Storage Partners will accrue prescriptive rights that would, after twenty years, eliminate Vandeleigh's easement altogether.

■ The law is clear that "an easement may be extinguished by adverse possession" by the owner of the servient estate,[44] and that "the adverse possession which will extinguish an easement must be of the same character and for the period required to give title to real estate by adverse possession."[45] Thus, to claim adverse possession of an easement a plaintiff must show that he has openly, exclusively, notoriously, continuously, and adversely possessed the easement for a period of twenty years.[46] If the use is permissive, it is not adverse.[47]

Vandeleigh argues that the "passage of time is all that is necessary for the elimination of the easement via [adverse possession.]" Therefore, the issue, according to Vandeleigh, is whether the Vice Chancellor's Order makes Storage Partners' possession of the easement area permissive. Vandeleigh suggests that the Order cannot operate to prevent Storage Partners from gaining rights in the easement area over time. The Vice Chancellor thought otherwise when he concluded: "Obviously because the improvements remain there by consequence of what this Court does or doesn't do, I don't see a time bar risk that might result in [Vandeleigh] losing its rights." We agree with the Vice Chancellor.

44. 25 Am. Jur. 2d Easements and Licenses in Real Property § 102. *See Pencader Assoc., Inc. v. Glasgow Trust,* 446 A.2d 1097, 1100 (Del.1982) ("Other equitable defenses can be asserted to extinguish ways-of-necessity. Adverse possession by the owner of the servient estate can be found, provided all of the elements of adverse possession are established."); *See also Edmonds v. Williams,* 54 Wash.App. 632, 634, 774 P.2d 1241 (1989).

45. 25 Am. Jur. 2d Easements and Licenses in Real Property § 102; *Edmonds,* 54 Wn.App. at 634, 774 P.2d 1241.

46. 25 Am. Jur. 2d Easements and Licenses in Real Property § 102; *See also Acierno v. Goldstein,* 2005 WL 3111993, *2, 2005 Del. Ch. Lexis 176, *11 (Del. Ch.2005); 10 Del. C. § 7901.

47. 25 Am. Jur. 2d Easements and Licenses in Real Property § 102.

The whole purpose of the litigation below was to settle the parties' respective rights in the easement area. The Vice Chancellor's Order did that and was clearly within his powers to fashion a remedy in this case. If the Order did not protect Vandeleigh from losing its rights through Storage Partners' continued use of the easement, it would require a built in twenty-year limitation. The Order includes no language to suggest that its terms will ever expire. Accordingly, if and when Vandeleigh can show that it has an imminent and viable use for the easement area, Storage Partners or its successor in interest, must remove obstructions to the easement. Vandeleigh should take appropriate steps to make the Order a matter of public record sufficient to protect its inchoate interest in the property and to inform potential purchasers of the Storage Partners' land of the obligations that come with purchasing the Storage Partners' property.

Although the terms of the Order imply that Storage Partners cannot gain full fee simple title to the easement area through adverse possession, we will remand this case to allow the Vice Chancellor to make this conclusion more explicit in anticipation that Vandeleigh will file the Order with the appropriate offices. The revised Order should also make it clear that its terms will bind any successor in interest to Storage Partners. Finally, we wish to make it clear that we understand the Order not to be limited to the "imminent and viable" use of the easement for vehicular ingress and egress upon obtaining regulatory approval. During the course of time the Order is in effect, other "imminent and viable" uses of the easement may arise, which may involve pedestrian rather than vehicular access and may not require Vandeleigh to obtain any regulatory approval.

*Castle Associates v. Schwartz*,[48] provides further support for the proposition that Storage Partners will gain no property rights to the easement area through adverse possession. In *Castle Associates*, the plaintiff, who owned the dominant estate, had an express but unlocated easement for ingress and egress over a small portion of the defendant's servient estate.[49] The easement traced back to a conveyance in 1903. In 1946, the defendant's predecessor-in-interest purchased the servient estate subject to the easement, and, in 1956 and 1957, erected a fence around the edges of his parcel, effectively blocking the pathway for the as yet unlocated easement.[50] In 1976, the plaintiff commissioned a title search that disclosed the existence of the easement. The plaintiff demanded that the defendant locate and open a right of way across his property. The defendant refused, and the plaintiff filed suit.[51] The defendant argued, among other things, that the erection of a fence around his property for more than the prescriptive period extinguished the plaintiff's easement by adverse possession. The Court disagreed.[52]

After examining several earlier New York cases, the Court derived the following rule:

> [W]here an easement has been created but no occasion has arisen for its use, the owner of the servient tenement may fence his land and such use will not be deemed adverse to the existence of the easement until such time as (1) the need

48. 63 A.D.2d 481, 407 N.Y.S.2d 717 (1978)

49. *Id.* at 484–486, 407 N.Y.S.2d 717.

50. *Id.* at 485, 407 N.Y.S.2d 717.

51. *Id.* at 486, 407 N.Y.S.2d 717.

52. *Id.* at 487, 407 N.Y.S.2d 717.

for the right of way arises, (2) a demand is made by the owner of the dominant tenement that the easement be opened and (3) the owner of the servient tenement refuses to do so.[53]

Applying this rule, the Court concluded that the erection of the fence on the defendant's property "prior to any demand for an opening of the right of way was not adverse to the existence of the easement, and . . . in light of the strong policy against the extinguishment of easements created by specific grant, the plaintiff is entitled to prevail."[54] Moreover, because "courts may exercise their equitable powers to locate an easement where the parties have failed to specifically designate the route" the Court concluded that the plaintiff was entitled to have a right of way located across the defendant's property.[55]

The New York Court of Appeals later clarified the *Castle Associates* rule in *Spiegel v. Ferraro*.[56] In *Spiegel*, the Court described the *Castle Associates* rule as a "narrow exception" to the general rule that "an easement may be lost by adverse possession if the owner or possesser of the servient estate claims to own it free from the private right of another, and excludes the owner of the easements, who acquiesces in the exclusion for [the prescriptive period.]"[57] The narrow exception "has evolved with regard to the extinguishment of easements that have not been definitively located through use."[58] Thus, the Court held that "where an easement has been definitively located and developed through use, there is no requirement that its owner demand the removal of obstructions blocking the easement before it may be extinguished by adverse possession."[59]

Applying this rule, the Court of Appeals reversed the intermediate appellate court's decision and reinstated the judgment of the trial judge, who held that the servient owner[60] had extinguished the plaintiff-dominant owner's right to use an express ingress and egress easement by adverse possession during the prescriptive period.[61] The Court noted that the plaintiff-dominant owner's predecessor in interest has used the easement in the past and faulted the intermediate appellate court for relying on the *Castle Associates* rule: "Since the easement was definitely and functionally in existence both before [the servient owner] closed it off in 1966 and during the period of the [servient owner's use], the exception of . . . *Castle* has no application here."[62]

After *Spiegel*, New York Courts sometimes stated the rule in the negative as: "A 'paper' easement, *not located and developed through use*, may not be extinguished by adverse possession absent a

---

53. *Id.* at 490, 407 N.Y.S.2d 717.

54. *Id.* at 491, 407 N.Y.S.2d 717.

55. *Id.*

56. 73 N.Y.2d 622, 543 N.Y.S.2d 15, 541 N.E.2d 15 (1989)

57. *Id.* at 626, 543 N.Y.S.2d 15, 541 N.E.2d 15.

58. *Id.*

59. *Id.* at 624, 543 N.Y.S.2d 15, 541 N.E.2d 15.

60. In *Spiegel*, the party who actually obstructed the easement leased the property from the servient owner. This distinction is irrelevant to our analysis, however, because "the [tenant] may enjoy the benefit of the extinguished easement during its tenancy and . . . that benefit will be presumed to inure to the landlord upon the expiration of the tenancy." *Id.* at 628, 543 N.Y.S.2d 15, 541 N.E.2d 15.

61. *Id.* at 625, 543 N.Y.S.2d 15, 541 N.E.2d 15.

62. *Id.* at 627, 543 N.Y.S.2d 15, 541 N.E.2d 15.

demand by the owner of the easement that the easement be opened, and a refusal by the party in adverse possession."[63] Other courts throughout the country have applied the *Castle Associates* rule to conclude that the owner of the servient estate did not extinguish the dominant estate's right to an easement through adverse possession. In *Kolouch v. Kramer*,[64] the Supreme Court of Idaho considered whether the obstructions the servient owner placed in the dominant owner's easement (including six spruce trees down the center of the easement, other trees, several large boulders, and a concrete irrigation diversion) were sufficient to extinguish title to the easement by adverse possession.[65] That case involved "an easement by written grant which has not been used by the . . . owners of the easement since its creation."[66] The Court paraphrased the *Castle Associates* rule as follows:

> [W]here the easement was created, but no occasion has arisen for its use, the owner of the servient tenement may plant trees, erect a fence, etc. and such use will not be deemed to be adverse (or inconsistent . . . ), until the need to use the easement arises, etc. We think this rule makes sense in light of the well

established rule that the owner of the servient estate is entitled to use his land, even though encumbered by an easement, for any purpose not inconsistent with the purpose reserved in the easement. Accordingly, [the servient owner]'s use of his property which was subject to the easement has not been adverse or inconsistent with the [dominant owners]'s rights prior to the time the [dominant owner]'s need to use the easement arose.[67]

Based on the foregoing authority, we are satisfied that, even assuming that the Vice Chancellor's Order once it is appropriately filed will not prevent Storage Partners or its successors in interest from gaining full fee simple title to the easement area through adverse possession, the *Castle Associates* rule will prevent Storage Partners from gaining full title. Even as narrowed by the *Spiegel* case, the *Castle Associates* rule still governs. While the easement here is certainly definitively located, it has not been developed through use.[68] Accordingly, applying the *Castle Associates* principle, Storage Partner's "use will not be deemed adverse to the existence of the easement until such time as . . . the need

---

**63.** *Will v. Gates*, 254 A.D.2d 275, 276, 678 N.Y.S.2d 119 (1998) (citing *Spiegel v. Ferraro*, 73 N.Y.2d 622, 626, 543 N.Y.S.2d 15, 541 N.E.2d 15; *Castle Assocs. v. Schwartz*, 63 A.D.2d at 490, 407 N.Y.S.2d 717; *Conway v. Hahn*, 208 A.D.2d 492, 617 N.Y.S.2d 52 (1994)) (emphasis added).; *See also Berry v. Southard*, 15 A.D.3d 516, 789 N.Y.S.2d 732 (2005) ("[S]o-called "paper" easements may not be extinguished by adverse possession absent a demand by the owner that the easement be opened and a refusal by the party in alleged adverse possession.").

**64.** 120 Idaho 65, 813 P.2d 876 (1991).

**65.** *Id.* at 66–67, 813 P.2d 876.

**66.** *Id.* at 67, 813 P.2d 876.

**67.** *Id.* at 68–69, 813 P.2d 876. *See also Mueller v. Hoblyn*, 887 P.2d 500 (Wyo.1994) (dominant owners' right to use easement not extinguished when servient owner drilled a well, grew various crops within the easement, and maintained boundary fencing.)

**68.** *See Mueller*, 887 P.2d at 509 ("We are persuaded that no portion of the easement granted . . . was terminated by adverse possession. [citations] *The easement has never been developed through use.* Therefore, the period of adverse possession began in 1990 when [the dominant owners] demanded the easement be opened and [the servient owner] refused.") (discussing *Spiegel*) (emphasis added).

for the right of way arises...."[69]

### CONCLUSION

The Vice Chancellor's Order, as it will be amended on remand consistent with this Opinion, carefully balances Vandeleigh and Storage Partners' respective rights in the easement area. We are satisfied that there is no danger that Storage Partners will ever obtain fee simple title to the easement area through adverse possession. We are confident that the Order on remand will generate an appropriate filing that will create covenants running with the land that will bind the current property owners and their successors in interest. The Court of Chancery possesses sufficient equitable and legal power to provide that any future use of the easement will be facilitated expeditiously and economically. Accordingly, we AFFIRM and REMAND the case to the Court of Chancery for further proceedings consistent with this Opinion. Jurisdiction is not retained.

**69.** *Castle Associates,* 63 A.D.2d at 490, 407 N.Y.S.2d 717.