Electronically Filed
Intermediate Court of Appeals
29968
30-SEP-2013
11:34 AM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

KEOLA CHILDS, Trustee under that certain unrecorded
Revocable Trust of Keola Childs, PHILIP L. WILSON,
III and CLARE H. WILSON, and DOUGLAS D. TROXEL,
Trustee of the Douglas D. Troxel Living Trust,
Plaintiffs-Appellants/Cross-Appellees,
v.
ALAN J. HARADA, WALTER HARADA, and KAREN FUKE,
Co-Trustees under that certain Trust made by
Junichiro Harada, dated April 21, 1981, MIKIE
HARADA, ALAN J. HARADA, SHARON S. HARADA,
Defendants-Appellees/Cross-Appellants,
and
JACK HIDETO OKAYAMA, WALLACE SADAO OKAYAMA, HATSUNE O. HIRANO,
Defendants-Appellees,
and
ETHEL NOBUKI TOKI, Trustee of the Ethel N. Toki
Revocable Living Trust, JOHN DOES 1-10, JANE
DOES 1-10, DOE PARTNERSHIPS 1-10, DOE CORPORATIONS
1-10, DOE ENTITIES 1-10, DOE GOVERNMENTAL AGENCIES
1-10 AND DOE ELEEMOSYNARY CORPORATIONS 1-10,
Defendants


NO. 29968


APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 05-1-0122K)


SEPTEMBER 30, 2013


NAKAMURA, C.J., FUJISE AND REIFURTH, JJ.

OPINION OF THE COURT BY REIFURTH, J.

The parties to this case own neighboring parcels of real property makai of the old Government Road, now known as Māmalahoa Highway (the "Highway") in Holualoa, District of North Kona, on the Island of Hawai'i. The case arose out of an action in which the Plaintiffs-Appellants sought, in part, to enjoin and restrain the Defendants-Appellees from interfering with or obstructing their use of two adjacent easements located on adjacent parcels for ingress, egress, and utility access across Defendants-Appellees' properties. The Circuit Court of the Third Circuit ("Circuit Court")[1] issued an injunction related to one of the easements while denying an injunction related to the other.

This appeal involves three sets of parties, a primary appeal, and a cross-appeal. Plaintiffs-Appellants/Cross-Appellees consist of Keola Childs, as Trustee under that certain unrecorded Revocable Trust of Keola Childs ("Childs"), Philip L. Wilson III and Clare H. Wilson (the "Wilsons"), and Douglas D. Troxel, as Trustee of the Douglas D. Troxel Living Trust ("Troxel") (collectively, the "Plaintiffs-Appellants").[2] Plaintiffs-Appellants filed a claim below for declaratory and injunctive relief, naming as defendants, among others, Defendants-Appellees Jack Hideto Okayama and Wallace Sadao Okayama (the "Okayamas");[3] and Defendants-Appellees/Cross-Appellants Alan J. Harada, as Co-Trustee under that certain trust made by Junichiro Harada Dated April 21, 1981; Mikie Harada, Trustee under that certain trust made by Mikie Harada, dated April 21, 1981; Alan J. Harada; and Sharon Harada (the

[1]    The Honorable Elizabeth A. Strance presided.

[2]    On October 11, 2005, Troxel was added as a plaintiff in the First Amended Complaint. Plaintiffs-Appellants, as used herein, refers to Childs and the Wilsons where the context pertains to events or proceedings before Troxel was added and includes Troxel where the context pertains to events or proceedings after he was added.

[3]    Hatsune O. Hirano ("Hirano") co-owns land with the Okayamas and was also a named defendant, but for convenience, in reference to the parties as they pertain to such land, we refer to them simply as the Okayamas, and unless otherwise indicated or apparent from context, we intend that such reference include Hirano.

"Haradas").

Plaintiffs-Appellants appeal and the Haradas cross-appeal from the June 25, 2009 Final Judgment as to All Claims and All Parties ("Final Judgment") entered by the Circuit Court. The Final Judgment was issued pursuant to prior orders including (1) the June 16, 2008 "Findings of Fact, Conclusions of Law, and Order Granting Defendants Okayama[s'] Motion for Summary Judgment Filed on 2/25/08"; (2) the March 16, 2009 "Finding[s] of Fact, Conclusions of Law and Order Granting Plaintiffs' Motion for Partial Summary Judgment Against [the Haradas], Filed on February 21, 2008 and Granting Plaintiffs' Motion for Entry of Default Judgment on Ethel Nobuki Toki on All Counts of the Complaint Filed, February 21, 2008"; and (3) the July 3, 2008 "Clerk's Taxation of Costs in Favor of Defendants [the Okayamas]."

Additionally, the Haradas cross-appeal from the July 22, 2005 "Order Granting Plaintiff's Ex Parte Motion for Issuance of Temporary Restraining Order," and the December 23, 2005 "Findings of Fact, Conclusions of Law, and Order Granting Plaintiff's Motion for Preliminary Injunction Filed July 18, 2005."

We hold that the Circuit Court erred in concluding, upon motions for summary judgment, that there were no genuine issues of material fact regarding both Plaintiffs-Appellants' intent to abandon an easement over the Okayamas' land and whether the Okayamas had terminated by prescription Plaintiffs-Appellants' rights in that easement. We affirm the Circuit Court's conclusion that it had jurisdiction to hear that portion of the case concerning the easement over the Haradas' land court property, but conclude that it erred in resolving the dispute over the scope of the easement on summary judgment because there were disputed issues of material fact. Consequently, we affirm in part and vacate/remand for further proceedings.

I.    BACKGROUND

On June 14, 2005, Plaintiffs-Appellants filed a Complaint for Declaratory and Injunctive Relief ("Complaint") against, among others, the Okayamas and the Haradas, asserting

3

land ownership as follows.  Childs claimed ownership of Parcel 6, Tax Map Key ("TMK") (3) 7-5-012:006, located in North Kona, County of Hawaiʻi, State of Hawaiʻi.  The Wilsons claimed ownership of Parcel 8, TMK (3) 7-5-012:008, and Troxel subsequently claimed ownership of Parcel 38, TMK (3) 7-5-012:038. Plaintiffs-Appellants alleged that Alan J. Harada, Walter Harada, and Karen Fuke owned a one-half undivided interest in Parcel 31, TMK (3) 7-5-012:031, also known as Lot 8-C (which was formerly part of Lot 8 before it was subdivided), Mikie Harada owned the other one-half undivided interest of Parcel 31, and Alan J. Harada and Sharon S. Harada owned a leasehold interest in the entirety of Parcel 31.  Plaintiffs-Appellants also contended that the Okayamas owned a one-half undivided interest in Parcel 29, TMK (3) 7-5-012:029, independent of Hirano, and Hirano owned the other one-half undivided interest in Parcel 29.  Finally, Plaintiffs-Appellants asserted that Ethel Nobuki Toki ("Toki") owned Parcel 32, TMK (3) 7-5-012:032.

The land at issue consists of a southern portion, which includes the Haradas' and Toki's parcels ("Southern Portion"), and a northern portion which is comprised of the Okayamas' parcel, Troxel's parcel, Childs' parcel, and the Wilsons' parcel ("Northern Portion").  The Southern Portion was derived from Royal Patent Grant 863 ("RPG 863"), and the Northern Portion was derived from Royal Patent Grant 982 ("RPG 982").  The Northern Portion is divided into two portions:  the makai portion, which includes the Wilsons' and Childs' parcels ("Makai Portion"), and the mauka portion, which includes Troxel's parcel and the Okayamas' parcel ("Mauka Portion").  The Mauka Portion parcels separate the Makai Portion parcels from the Highway.

Two easements run along a portion of the boundary that divides the Northern Portion from the Southern Portion.  The first easement, referred to as the 25' Right of Way, traverses the Mauka Portion's entire southern boundary.  The second easement, just south of the 25' Right of Way, is referred to as Easement 3, and traverses the entire northern boundary of the Southern Portion.  The two easements run adjacent to each other, in a mauka-makai orientation, along the southern boundary of the

Mauka Portion/northern boundary of part of the Southern Portion; thereafter, Easement 3 continues further makai, along and coterminous with the northern boundary of Toki's parcel in the Southern Portion, abutting both Childs' and a portion of the Wilsons' parcel in the Northern Portion.

   The map located on the following page depicts the parcels and easements at issue:[4/]

  A. The Okayamas, the Northern Portion, and the 25' Right of Way

   The Complaint asserted that RPG 982 (constituting the Northern Portion) was comprised, in relevant part, of Parcels 5 (TMK (3) 7-6-012:005), 6, 8, 29, and 38. It also contended that, in 1896, a circuit court issued a decree ("1896 Decree") that partitioned RPG 982 from sixty acres into two roughly thirty-acre parcels; the aforementioned Mauka and Makai Portions. The Mauka Portion included what became Parcels 29 and 38. The Makai Portion included what became Parcels 5, 6, 7, and 8. The Mauka and Makai Portions were divided by the property line between Parcels 5 and 38 running parallel to the Highway ("Mauka/Makai Boundary Line"). *See* Map *infra*. The 1896 Decree also identified a "25' Right of Way" as running from the Highway to the southern tip of the Mauka/Makai Boundary Line by way of the Mauka Portion's southern boundary, thus traversing what became Parcels 29 and 38, and thereby providing Highway access to what became Parcels 5, 6, and 8.[5/] Plaintiffs-Appellants requested declaratory relief in the form of a judgment entitling them to an appurtenant right to use the 25' Right of Way over Parcel 29 and injunctive relief such that the Okayamas would not interfere with their use of the 25' Right of Way for access and water line purposes.

---

  [4/] There are limited references in this opinion to Lots 7 and 8-C (or 8), particularly in the context of older land court documents. References to Lots 7 and 8-C (the latter comprising the majority of what was Lot 8 before it was subdivided) correspond to Parcels 32 and 31, respectively.

  [5/] Specifically, the 1896 Decree stated that the Mauka Portion was "subject[ed] to a right of way from the [Makai Portion] to the [Highway]; which right of way shall be twenty-five feet wide and situate [sic] on the south side of the [Mauka Portion]."



B.    The Haradas, the Southern Portion, and Easement 3

The Complaint also asserted that on June 8, 1953, the Roman Catholic Church ("Church") filed Land Court Application No. 1666 (the "Application") to register and confirm its title to a twelve-lot portion of RPG 863.  The Complaint alleged that the Application specified that Lots 7 and 8 (Parcels 32 and 31, respectively, and constituting the Southern Portion) were subject to a 16' easement for roadway purposes and designated this as "Easement 3."  The Application further specified that there were public ways running through the twelve lots, disclaimed ownership of any public land, and requested that the public ways be determined.  The Complaint also cited a June 18, 1953 land court examiner's report,[6] which stated that:

> Certain of the lots, Nos. 3, 4, 7, 8, and 12 are
> subject to easements for either public road purposes
> or electric transmission lines, while Lot. [sic] 10 is
> subject to an easement in favor of Exclusion 2.  All
> easements are described fully in the application and
> are shown on the map accompanying same.

(Emphasis omitted; brackets in original.)  The Complaint referenced a map filed with the Application, which depicted Easement 3 as traversing the northern boundary of Parcels 31 and 32 (i.e., the Southern Portion).  Plaintiffs-Appellants cited the land court's decision as stating:

> that the applicant has and possesses title in fee
> simple to the land described in the application and
> delineated and described upon the map or plan
> accompanying the application and the survey as
> approved by the territorial surveyor, proper for
> registration, subject, however, to the easements as
> set forth in the application[.]

(Brackets in original.)

In addition, the Complaint asserted that when the Church conveyed Parcel 31 (Lot 8) to the Haradas' predecessor in interest, the deed stated that:

> Lot 8 is SUBJECT, HOWEVER, to an Easement sixteen
> (16.00) feet wide for a roadway designated as EASEMENT

---

[6]    The Southern Portion is further differentiated from the Northern Portion by the fact that the parcels included in the Southern Portion are included in the land court, or Torrens System, of property registration.  The land court system is governed by chapter 501 of the Hawaii Revised Statutes ("HRS").  The parcels included in the Northern Portion, on the other hand, are included in the Regular System of registration, which is governed by chapter 502, HRS.

> 3 on the map filed together with Land Court
> Application 1666[.]

(Emphasis omitted; brackets in original.) Similarly, it alleged that the deed from the Church to Toki's predecessors in interest in Parcel 32 conveyed:

> Lot 7, area 14.045 acres, as shown on the Map on file
> [in Land Court], . . . with Land Court Application No.
> 1666[.]
>
> SUBJECT, HOWEVER, to an Easement sixteen (16.00) feet
> wide for a roadway designated as EASEMENT 3 on the map
> filed together with Land Court Application 1666[.]

(Emphasis omitted; brackets in original.)

In the Complaint, Childs claimed that in 1978, he purchased Parcel 6, and his company, Freestyle Corporation, purchased Parcel 5. Childs claimed that his deed to Parcel 6 stated that there was a sixteen-foot easement as described in Land Court Application No. 1666. Childs also stated that, after obtaining the Haradas' permission, he graded and paved, and installed water lines along, Easement 3 between the Haradas' house and Parcels 5 and 6; in doing so, he agreed to, and did, reimburse the Haradas for one-half of the costs they had already incurred in paving the portion of Easement 3 between their home and the Highway. Childs maintained that since that time he had continued to use Easement 3 and that it is currently the only means of accessing Parcel 6.

The Wilsons claimed that after purchasing Parcel 8 in 1998, they have used Easement 3 to access their property and similarly improved a portion of Easement 3 traversing Parcel 32, extending from Childs' driveway on Parcel 6 to their residence on Parcel 8.

The Complaint alleges that, in 2004, Childs and the Wilsons were informed by the Haradas that they would no longer be permitted to use Easement 3, and that the Okayamas had also refused to permit Childs and the Wilsons to use the 25' Right of Way.

C. The Okayamas' Answer and Counterclaim

On July 8, 2005, the Okayamas filed an answer to the Complaint and a counterclaim against Plaintiff-Appellants

("Counterclaim"). The Okayamas admitted Plaintiffs-Appellants' and the Okayamas' land ownership as alleged and admitted further that they had refused to permit Plaintiffs-Appellants' use of the 25' Right of Way, while denying that there existed any such 25' Right of Way. All other allegations were denied. The Okayamas also asserted the defenses of bona fide purchasers without notice, laches, adverse possession/termination by prescription, termination by abandonment, and termination by estoppel. The Okayamas' Counterclaim sought a declaration that Parcel 29 was free and clear of any easements encumbering it for the benefit of Parcels 6 and 8.

D.    The Haradas' Answer

On July 25, 2005, the Haradas filed an answer to the Complaint. The Haradas admitted that they were the owners of Parcel 31, as derived from RPG 863, but denied that the roadway mentioned in the land court application, i.e., Easement 3, had any relation to Parcels 6 and 8, as those parcels were not part of Land Court Application No. 1666. The Haradas contended that Easement 3 was for use only by the parcels mentioned in Land Court Application No. 1666, i.e., Parcels 31 and 32. The Haradas asserted additional defenses; in particular, that the Circuit Court lacked jurisdiction pursuant to HRS § 501-1 because the Haradas' property was registered in land court, and that Plaintiffs-Appellants' claim should be denied because no easements benefitting Parcels 6 and 8 appear on the Haradas' Transfer Certificate of Title.

E.    Answer to the Okayamas' Counterclaim

On July 26, 2005, Plaintiffs-Appellants filed an answer to the Okayamas' Counterclaim. They claimed, among other things, that the Okayamas "lack standing to assert their claims contained in the Counterclaim because they do not have clear legal title to parcel 29."

F.    Temporary Restraining Order and Preliminary Injunction

On July 18, 2005, Plaintiffs-Appellants filed a Motion

for Preliminary Injunction regarding Easement 3. The Wilsons claimed that their water line was cut and that the Haradas refused to allow any repair efforts, thereby causing water to leak continuously.

Similarly, on July 19, 2005, Plaintiffs-Appellants filed an ex parte motion for issuance of a temporary restraining order ("TRO Motion"). On July 22, 2005, the Circuit Court granted the TRO Motion, thereby prohibiting the Haradas from interfering with Plaintiffs-Appellants' use of Easement 3 until the court ruled on the Motion for Preliminary Injunction.

On December 23, 2005, the Circuit Court issued its Findings of Fact, Conclusions of Law, and Order Granting Plaintiffs' Motion for Preliminary Injunction Filed July 18, 2005 ("Preliminary Injunction Order").

G.    Motion to Dismiss Counterclaim

On December 7, 2007, Plaintiffs-Appellants filed a motion to dismiss the Okayamas' Counterclaim ("Motion to Dismiss") "on the grounds that [the Okayamas lacked] standing to bring the Counterclaim and therefore, the [Circuit] Court is without subject matter jurisdiction to adjudicate the claims stated therein." On April 2, 2008, the Circuit Court denied the motion.

H.    Motions for Summary Judgment

In February 2008, Plaintiffs-Appellants filed a motion for partial summary judgment against the Okayamas ("MPSJ Against the Okayamas"), and the Okayamas filed their motion for summary judgment against Plaintiffs-Appellants ("Okayamas' MSJ"). Plaintiffs-Appellants also filed a motion for partial summary judgment against the Haradas ("MPSJ Against the Haradas").

On June 16, 2008, the Circuit Court issued findings of fact and conclusions of law, and an order granting the Okayamas' MSJ. The Circuit Court concluded that Plaintiffs-Appellants' predecessors in interest had abandoned rights to the 25' Right of Way, and separately, that such rights had been terminated by prescription.

On March 16, 2009, the Circuit Court issued its findings of fact and conclusions of law, and an order granting the MPSJ Against the Haradas. The Circuit Court concluded that it had jurisdiction over the case under HRS § 501-1 despite the easement at issue running over land court property, and granted summary judgment for Plaintiffs-Appellants. While declining to construe Easement 3 as a public easement without limitation, its ruling recognized Plaintiffs-Appellants' right to continue use of Easement 3 to the extent that the lot density of their parcels did not increase.

On June 25, 2009, the Circuit Court entered the Final Judgment. Plaintiffs-Appellants filed a timely appeal, and the Haradas filed a timely cross-appeal.

II. POINTS OF ERROR

On appeal, Plaintiffs-Appellants contend that the Circuit Court committed reversible error in (1) denying the Motion to Dismiss because the Okayamas lacked standing to bring their claims; (2) denying Plaintiffs-Appellants' MPSJ Against the Okayamas and granting the Okayamas' MSJ because Plaintiffs-Appellants proved that there was no genuine issue of fact to be tried regarding the Okayamas' claims and defenses and that the Okayamas had notice of the 25' Right of Way; and (3) finding and concluding both that Easement 3 is not a public road and that an increase in lot density would exceed the scope of the contemplated use of Easement 3.

On cross-appeal, the Haradas contend that the Circuit Court erred in (1) granting Plaintiffs-Appellants' motion for issuance of a temporary restraining order because (a) it did not have subject matter jurisdiction over the issue, and (b) Plaintiffs-Appellants were unlikely to succeed on the merits; (2) granting Plaintiffs-Appellants' motion for preliminary injunction because (a) it did not have subject matter jurisdiction over the issue, and (b) Plaintiffs-Appellants were unlikely to succeed on the merits; (3) granting partial summary judgment against the Haradas and entering default judgment against Toki; and (4) entering final judgment.

11

III. STANDARDS OF REVIEW

Jurisdiction

> The existence of jurisdiction is a question of law that we review de novo under the right/wrong standard. Questions regarding subject matter jurisdiction may be raised at any stage of a cause of action. When reviewing a case where the circuit court lacked subject matter jurisdiction, the appellate court retains jurisdiction, not on the merits, but for the purpose of correcting the error in jurisdiction. A judgment rendered by a circuit court without subject matter jurisdiction is void.

*Lingle v. Hawai'i Gov't Emps. Ass'n, AFSCME, Local 152, AFL-CIO*, 107 Hawai'i 178, 182, 111 P.3d 587, 591 (2005) (quoting *Amantiad v. Odum*, 90 Hawai'i 152, 158-59, 977 P.2d 160, 166-67 (1999)).

Standing

"Whether the circuit court has jurisdiction to hear the plaintiffs' complaint presents a question of law, reviewable *de novo*. A plaintiff without standing is not entitled to invoke a court's jurisdiction. Thus, the issue of standing is reviewed *de novo* on appeal." *Right to Know Comm. v. City Council, City & Cnty. of Honolulu*, 117 Hawai'i 1, 7, 175 P.3d 111, 117 (App. 2007) (quoting *Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n*, 113 Hawai'i 77, 90, 148 P.3d 1179, 1192 (2006)) (internal quotation marks omitted).

Summary Judgment

The appellate court reviews "the circuit court's grant or denial of summary judgment de novo." *Querubin v. Thronas*, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (quoting *Durette v. Aloha Plastic Recycling, Inc.*, 105 Hawai'i 490, 501, 100 P.3d 60, 71 (2004)).

The Hawai'i Supreme Court has often articulated that:

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light

most favorable to the party opposing the motion.

*Id.* at 56, 109 P.3d at 697 (brackets omitted) (quoting *Durette*, 105 Hawai'i at 501, 100 P.3d at 71).

Furthermore, in deciding a motion for summary judgment, a circuit court must keep in mind an important distinction:

> A judge ruling on a motion for summary judgment cannot summarily try the facts; his role is limited to applying the law to the facts that have been established by the litigants' papers. Therefore, a party moving for summary judgment is not entitled to a judgment merely because the facts he offers appear more plausible than those tendered in opposition or because it appears that the adversary is unlikely to prevail at trial. This is true even though both parties move for summary judgment. Therefore, if the evidence presented on the motion is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper.

*Kajiya v. Dep't of Water Supply*, 2 Haw. App. 221, 224, 629 P.2d 635, 638-39 (1981) (quoting 10 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2725 (1973)).

IV. DISCUSSION

A. Plaintiffs-Appellants' Appeal as to the Okayamas

1. Plaintiffs-Appellants' Motion to Dismiss

Plaintiffs-Appellants contend that the Okayamas lacked standing to bring their Counterclaim because of an alleged break in the Okayamas' chain of title. They assert, without reference to any authority, that in order for the Okayamas to sustain their action, the Okayamas must prove that they have legally cognizable private title to Parcel 29. Plaintiffs-Appellants' argument fails.

Standing need not rest on ownership. Nowhere does it appear that the parties dispute that the Okayamas have been in possession, or have asserted the rights of possession, of Parcel 29. Such possession sufficed to confer standing on the Okayamas such that the Circuit Court could determine whether the Okayamas could enjoy Parcel 29 free and clear of Plaintiffs-Appellants' claimed entitlement to the alleged easement across their land. *See* 59 Am. Jur. 2d *Parties* § 39 (2002) ("[O]ne in rightful possession of real property is the proper person to sue for the injury to the possession[.]").

Accordingly, the Circuit Court properly denied Plaintiffs-Appellants' Motion to Dismiss.

    2.    The Circuit Court erred in granting the Okayamas'
          MSJ and correctly denied Plaintiffs-Appellants'
          MPSJ against the Okayamas.

Plaintiffs-Appellants challenge both the Circuit Court's denial of Plaintiffs-Appellants' MPSJ Against the Okayamas and its grant of the Okayamas' MSJ.  Plaintiffs-Appellants contend that they had demonstrated that no genuine issue of material fact existed regarding the Okayamas' claims and defenses—in particular, regarding whether (a) Plaintiffs-Appellants had abandoned the 25' Right of Way, (b) the Okayamas had terminated that easement by prescription, and (c) Troxel had an implied easement over Parcel 29.  We agree that the Circuit Court erred, but only with respect to granting the Okayamas' MSJ.

    a.    Abandonment
The Okayamas contend that the Circuit Court was correct in ruling that Plaintiffs-Appellants had abandoned their easement rights, as deeded to them by the 1896 Decree.  They argue that Plaintiffs-Appellants and their predecessors in interest had never used the easement, that they instead utilized a different means of ingress/egress, and that they acquiesced to the Okayamas' use of the easement area as physically preventing Plaintiffs-Appellants' exercise of their easement rights.  On the other hand, Plaintiffs-Appellants argue that the potential exercise of their easement rights was not negated by the Okayamas' use of the easement area and that their nonuse of the 25' Right of Way and alternative means of access could not constitute proof of abandonment.  We hold that the Circuit Court erroneously concluded that there was no genuine issue of material fact regarding the Okayamas' abandonment defense.

Several principles guide the review of whether a deeded easement has been abandoned by the owner of the dominant estate:

> The cases are agreed that at least where a right of
> way is created by grant, deed, or reservation, no duty is
> thereby cast upon the owner of the dominant estate to make
> use thereof as a condition to the right to retain his
> interest therein, and that mere nonuser, even for the
> prescriptive period, will not extinguish an easement created

14

> by grant, deed, or reservation. . . . The intention to abandon is the material question and may be proved by an infinite variety of acts. It is a question of fact to be ascertained from all the surrounding circumstances, such as permitting it to be closed for a long period of time, during which the owner of the servient estate spends large sums of money in its improvement. The acts claimed to constitute the abandonment must show a destruction of the easement, impossibility of its legitimate use resulting from some act of the easement owner or his acquiescence in acts of others inconsistent with a future enjoyment of the easement. The burden of proving abandonment is upon the party alleging it and must be established by clear and unequivocal evidence of decisive and conclusive acts.

*Fleming v. Napili Kai, Ltd.*, 50 Haw. 66, 68-69, 430 P.2d 316, 318 (1967) (quoting *Goo v. Young*, 36 Haw. 132, 148 (Haw. Terr. 1942)).

What bears emphasis here is that the issue of abandonment is fundamentally a question of intent, and, therefore, ultimately a question of fact. *See id.* As such, it is generally for the trier of fact to resolve. *Peck v. Baltimore Cnty.*, 410 A.2d 7, 9 (Md. 1979) ("The question of whether there has been an abandonment of an easement is usually one of fact for the trial court or jury." (citation omitted)).

Here, however, the Circuit Court reached its determination that Plaintiffs-Appellants had abandoned their easement over the Okayamas' land not at trial, but upon motions for summary judgment. In so doing, the Circuit Court considered and made factual findings regarding evidence of the history of Plaintiffs-Appellants' and their predecessors' nonuse of the 25' Right of Way since issuance of the 1896 Decree; the presence of items within the 25' Right of Way that may have interfered with, if not outright prevented, utilization of the easement;[2] the

---

[2] Specifically, the Circuit Court considered evidence of a "dry stack rock wall" that allegedly stood for a period, blocking access to the makai side of Parcel 29, the presence of a portion of a *hoshidana* within the 25' Right of Way, and trees planted throughout the easement area. As to the *hoshidana*, the Circuit Court described it as "a coffee-drying structure," oriented north-south:

> approximately 15 to 30 feet wide, 80 to 100 feet long, . . . 10 to 15 feet high[, and] supported by approximately 12 4" x 4" wooden posts. A wooden drying platform was on the northern half of the *hoshidana*. The drying platform could be covered with a moveable roof set on metal wheels on pipe tracks. This roof was slid over the drying platform to protect the coffee from rain in the evening, and was slid off the platform to allow the coffee to dry in the sun during the day. The roof sat approximately 1 foot
> (continued...)

absence of any objection by Plaintiffs-Appellants to the presence of these items; and Plaintiffs-Appellants' improvement and utilization of an alternate means of access to their property (Easement 3). Each of these is relevant evidence of whether Plaintiffs-Appellants intended to abandon the easement. *See* 53 Am. Jur. Proof of Facts 3d 519 *Proof of Intent to Abandon Easement* §§ 13, 14, 16, 18.5 (1999).

But to the extent that the Circuit Court inferred from these findings that Plaintiffs-Appellants had therefore abandoned their rights to the 25' Right of Way, it was in error. Once it evaluated and drew disputed inferences from predicate facts to determine the essential fact at issue, it exceeded its role in adjudicating the motions for summary judgment and partial summary judgment,[8] for it was not for the court to "summarily try the facts." *Kajiya v. Dep't of Water Supply*, 2 Haw. App. 221, 224, 629 P.2d 635, 638-39 (1981) (quoting 10 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2725 (1973)). Furthermore, under summary judgment principles, any inferences drawn should have been drawn adversely as to each movant. *See Querubin v. Thronas*, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (quoting *Durette v. Aloha Plastic Recycling, Inc.*, 105 Hawai'i 490, 501, 100 P.3d 60, 71 (2004)). Therefore, it would have been appropriate for the Circuit Court to infer an intent to abandon only as to Plaintiffs-Appellants' MPSJ Against the Okayamas, and the court should have inferred the opposite as to the Okayamas' MSJ, thereby defeating each motion.

To the extent that the Circuit Court otherwise concluded that summary judgment was warranted as a matter of law,

---

[7] (...continued)
above the drying platform. The roof slid off the drying platform to the south end of the structure and the tracks were supported by the 4" by 4" posts. The south end of the structure extended to approximately 5 feet from the southern boundary of Parcel 29 and 20 feet within the 25-foot right of way.

[8] The Circuit Court also erred in concluding that the *hoshidana* "effectively block[ed] approximately 20 feet of the right of way[.]" Plaintiffs-Appellants plausibly disputed the extent to which the *hoshidana*—in particular, its support elements—would have impaired utilization of the easement for purposes of passage. Therefore, insofar as the degree of impairment was material to its conclusion, the Circuit Court erred in concluding on summary judgment that the right of way was effectively blocked.

this too was in error. The Circuit Court relied on two different sets of facts and principles to support its conclusion of abandonment, each of which might have provided support for a finding of abandonment, but neither of which necessarily *proved* it. We address them in turn.

First, the Circuit Court found that (a) between 1896, when the easement was created, and 1940, none of the several conveyance documents relating to Plaintiffs-Appellants' lands expressly referenced the 25' Right of Way; and (b) from 1978 to 1979, Plaintiffs-Appellants or a predecessor in interest substantially improved Easement 3, including paving over half a mile of, and installing water lines within, that alternate route. The Circuit Court concluded that these constituted affirmative acts "evidenc[ing] an intent to abandon the [25' Right of Way]."

While these facts might support such a finding, they do not conclusively prove it. We are not aware of any legal principle, binding or otherwise, that holds as abandoned an unutilized easement appurtenant merely because it is not expressly included as part of a conveyance. Additionally, while Plaintiffs-Appellants, or a predecessor in interest, did more than merely utilize a (more) convenient means of access—they substantially improved the already-cleared Easement 3 rather than clearing brush, trees, and other impediments from the 25' Right of Way—utilization of an alternate means of access is not itself proof of abandonment. *See Smith v. Muellner*, 932 A.2d 382, 396 (Conn. 2007). And while the history of nonuse of the 25' Right of Way may be some evidence of abandonment, it is of itself insufficient to support such a finding. *Goo*, 36 Haw. at 148-49; *accord Goodwin v. Lofton*, 662 S.W.2d 215, 217 (Ark. Ct. App. 1984). Furthermore, it appears that at the time of the improvements, Plaintiffs-Appellants may not have been aware of their rights over the 25' Right of Way.[9]

---

[9] The Circuit Court found that Childs did not become aware of his rights until sometime in the 1980s, and it is unclear whether the Wilsons' predecessor in interest was aware of his or her rights to the easement. Wilson's deed conveyed the 25' Right of Way, but he mistakenly believed that his rights were to Easement 3.

Whether awareness of a right is a prerequisite to abandonment of that right, *cf. Adams v. Buchanan*, 49 Mo. 64, 67 (1871) ("[N]or can [a lien's] abandonment be predicated upon acts that merely indicate ignorance of its existence . . . ."), is not something we decide here, but we do reasonably conclude that it may inform the understanding of an act otherwise inconsistent with possession of that right. On the facts recited above, the issue of Plaintiffs-Appellants' intent to abandon their rights remained in dispute.

Second, the Circuit Court found that certain acts by the Okayamas had prevented use of the 25' Right of Way, and that Plaintiffs-Appellants, or their predecessors in interest, had acquiesced to "structures which prevented the use of the right of way, evidencing an intent to abandon." Specifically, in addition to the planting and presence of trees within the easement area, the Circuit Court found that the *hoshidana* "effectively block[ed]" approximately twenty feet of the right of way, and that an erstwhile dry stack rock wall running along and through the right of way "evidenc[ed] an intent of exclusivity on the part of the Okayamas."

The issue of Plaintiffs-Appellants' awareness of their easement rights notwithstanding, and even assuming for the sake of argument that lengthy acquiescence to the erection of structures of a perhaps permanent nature preventing would-be enjoyment of easement rights might reach the level of determining abandonment as a matter of law,[10] summary judgment is still inappropriate here. The Circuit Court erred in making a finding that the easement was "effectively block[ed]" by the *hoshidana*, as this issue was firmly in dispute. As noted *supra*, note 8, Plaintiffs-Appellants plausibly disputed the extent to which the elevated *hoshidana* would have necessarily impaired utilization of

---

[10] Indeed, the erection or installation of structures by the servient estate on, within, or around an easement, and the dominant estate's acquiescence to that structure, *may* be relevant to a determination of intent to abandon, but does not conclusively prove abandonment as a matter of law. *Goo*, 36 Haw. at 149-50 ("The owner of the servient estate may subject it to various uses without prejudice to the rights of the owner of the dominant estate and without imposing upon the owner of the dominant estate the duty of affirmative action to negative an intention to abandon his easement.").

the easement. It was similarly error for the court to otherwise find, on the basis of the trees and the rock wall, that ingress and egress was so permanently impeded as to necessitate a finding of an intent to abandon easement rights.

Mindful of the premise that the issue of abandonment is ultimately a factual question of intent, factors such as ignorance of rights of ownership, the degree to which a physical impediment impairs utilization of an easement (not to mention the ease with which such an impediment (such as a dry stack rock wall) might later be mitigated or removed), the length of time that the impediment existed, and the evidence of acquiescence to the erection or presence of the impediment, may each be materially relevant to the inquiry at hand. We therefore hold that summary judgment on the issue of abandonment was appropriate for neither party.

b.     Termination by prescription

On facts largely in common with their abandonment defense, the Okayamas also asserted below the defense that Plaintiffs-Appellants' rights in the 25' Right of Way were terminated by prescription.[11] The Circuit Court agreed with the Okayamas, citing, in part, case law relevant to the law of both adverse possession and the extinguishment of easements. In order to determine whether either Plaintiffs-Appellants or the Okayamas had proven, as a matter of law, that they had prevailed on the issue of termination by prescription, we first address the showing that either must have made in order to prevail.

While Hawai'i case law has addressed creation of easements by prescription, *see, e.g.*, *Nature Conservancy v. Nakila*, 4 Haw. App. 584, 671 P.2d 1025 (1983), there is no case law in Hawai'i addressing termination by prescription of an

_____

[11]     The phrase "termination by prescription" refers to the extinguishment of a dominant estate's easement rights through acts of the servient estate owner that are sufficiently adverse to the dominant estate's rights in the easement. It is closely linked to the concept of adverse possession, *see Mueller v. Hoblyn*, 887 P.2d 500, 507 (Wyo. 1994), but, as discussed *infra*, the showing required to establish termination by prescription differs materially from that of adverse possession.

existing easement.  We therefore consider other jurisdictions and authorities that have addressed such claims.

In *Matoush v. Lovingood*, the Colorado Supreme Court stated:

> An easement is terminated by adverse possession upon a showing that use of the easement area was: (1) adverse to the easement holder's use of the easement; (2) open or notorious; and (3) continuous, without effective interruption, for the statutorily-mandated period of time for adverse possession.  To be adverse, use of the easement area must be incompatible or irreconcilable with the easement holder's right to use the easement.

177 P.3d 1262, 1265 (Colo. 2008).[12]  This is in accord with several treatises.  25 Am. Jur. 2d *Easements & Licenses* § 102 (2004); Jon. W. Bruce et al., *The Law of Easements and Licenses in Land* § 10:25 (2012); 4 R. Powell, *Powell on Property* § 34.21 (2010); 7 D. Thomas, *Thompson on Real Property* § 60.08(b)(7) (2d ed. 2006).

Although the elements for termination of an easement by prescription are the same as those for creation of an easement by prescription, there is an important conceptual distinction between the two.

> The distinguishing factor between the creation and termination of easements by prescription is that in the former situation the user must be adverse to the possessor of the land, while in the latter the use, while adverse to the owner of the easement, is made by the servient tenant on land in his or her own possession.  This creates some difference in the type of use that will be considered sufficiently adverse to start the prescriptive period.

4 Powell, *supra*, § 34.21[1].  Prescriptively terminating easement rights "requires that the showing of adversity and hostility be stronger than that required to take possession of land [or create rights to an easement] by adverse possession [or prescription]." 7 Thomas, *supra*, § 60.08(b)(7); *accord Matoush*, 177 P.3d at 1270. Specifically, "[o]nly use that is 'incompatible or irreconcilable with the [easement holder's] authorized right of use' will be sufficient to justify terminating an easement by [prescription]." *Matoush*, 177 P.3d at 1270 (quoting 4 Powell, *supra*, § 34.21[1]). "[A] party claiming to have terminated an easement by

---

[12]   The Colorado Supreme Court opted for the term "termination by adverse possession" rather than "termination by prescription," and recognized these terms as different in name only.  *See Matoush*, 177 P.3d at 1264 n.2.

[prescription] must prove 'that the use interferes significantly enough with the easement owner's enjoyment of the easement to give notice that the easement is under threat.'" *Id.* (quoting 7 Thomas, *supra*, § 60.08(b)(7)(i)). Only upon such use will the prescriptive clock be triggered. *See id.* at 1271. Determining what use qualifies, however, "depends on the circumstances of each case." *Id.*

Additional considerations apply where the easement at issue has been expressly created, but, as here, never used or improved by the dominant estate.

> When an easement is not in use, the owner of the property burdened by the easement enjoys "an enlarged scope of privileged action." [4 Powell, *supra*, § 34.21[1].] Logically then, the owner of a property burdened by an easement enjoys the largest scope of privileged action when the easement has never been used. . . .
>
> . . . When an easement is expressly created but never used, the extent to which the owner of the property burdened by the easement can use the easement area expands to resemble the owner's right to use the property as if it were unburdened by the easement. At the same time, the easement holder's right to use the easement receives greater protection because the easement holder's right to use the easement has not yet come into functional existence.

*Id.; see also id.* (Eid, J., concurring) ("Where . . . an easement holder has not developed the easement, the servient estate owner may use the easement area to a far greater extent than in a case involving a developed easement.").

A New York case, *Castle Assocs. v. Schwartz*, 407 N.Y.S.2d 717 (App. Div. 1978), is commonly cited in cases involving termination by prescription of unused easements. *Castle* involved a roadway easement that was both never used and never precisely located. 407 N.Y.S.2d at 721. After reviewing cases from New York and other jurisdictions, it enunciated the rule that:

> [W]here an easement has been created but no occasion has arisen for its use, the owner of the servient tenement may fence his land and such use will not be deemed adverse to the existence of the easement until such time as (1) the need for the right of way arises, (2) a demand is made by the owner of the dominant tenement that the easement be opened and (3) the owner of the servient tenement refuses to do so.

21

*Id.* at 723.[13]/ The rule announced in *Castle* was not newly formulated. Rather, it was a modern restatement of old law regarding prescriptive termination of an easement where there had been no use or specific location of the easement. *See Litchfield v. Boogher*, 142 S.W. 302 (Mo. 1911); *Storrow v. Green*, 178 P. 339 (Cal. Dist. Ct. App. 1918).

In *Spiegel v. Ferraro*, New York's highest court later discussed and distinguished *Castle*, characterizing it as a "narrow exception" to the general rule regarding prescriptive termination of easement rights, and applicable to "easements that have not been definitively located through use." 541 N.E.2d 15, 17 (N.Y. 1989). *Spiegel* explained:

> The theory underlying the exception is that easements not definitively located and developed through use are not yet in functional existence and therefore the owner of the easement could not be expected to have notice of the adverse claim until either the easement is opened or the owner demands that it be opened. It is only at such point, therefore, that the use of the easement by another is deemed to be adverse to the owner and the prescriptive period begins to run. So understood, the exception is consistent with the general theory of adverse possession -- that the real owner may, by unequivocal acts of the usurper, have notice of the hostile claim and be thereby called upon to assert his legal title[.]

*Id.* (citations and internal quotation marks omitted).[14]/

The Colorado Supreme Court, in *Matoush*, examined *Castle* and *Spiegel*, and surveyed other jurisdictions, stating:

> Despite possible uncertainty created by *Spiegel* as to the factual circumstances to which the *Castle Associates* rule applies, courts in other jurisdictions have applied the rule to myriad factual circumstances. Courts apply the *Castle Associates* rule irrespective of whether the easement's location was specifically identified in the conveyance, or whether the easement holder's property had been developed. Although these cases are factually unique, courts have consistently applied the *Castle Associates* rule to cases in which the easement at issue was expressly created but never used.

177 P.3d at 1273 (footnote omitted).

---

[13]/    At times herein, we refer to the second part of *Castle*'s rule as its "demand requirement."

[14]/    The *Spiegel* court noted that the landowner's lessee had installed two gates to which only he had the key, regraded the easement, installed lights, utilized guard dogs to patrol the premises at night, and parked wrecked cars over the easement such that the plaintiff had not driven a car over it since that time. 541 N.E.2d at 16. It then held that since the easement went unused for the prescriptive time period, the easement was terminated by prescription. *Id.* at 18.

The court then explained its basis for adopting the rule:

> There are a number of policy reasons that support the *Castle Associates* rule. First, as we previously explained, the rule is consistent with the notion that the owner of the property burdened by the easement retains the right to use his or her property in any way that does not interfere with the easement holder's right to use the easement. Second, the rule comports with the long-established principle that an easement cannot be lost by mere nonuse. Third, this rule respects recorded easements, which are easily traceable through title instruments. Fourth, purchasers of property have a duty of inquiry to determine whether an easement burdens the property and are on constructive notice of such easements. Fifth, the purchase price of property reflects the benefit or burden of an easement, and the rule reinforces bargains made between buyers and sellers. Last, the rule prevents an easement holder from incurring litigation and expense to guard his or her right to use the easement, as one court noted: "[W]ithout such a rule, [easement holders] may feel compelled to start litigation, clear obstacles, or otherwise force an issue . . . merely to keep alive a record easement right, even though the need to use the easement has not yet fully matured." *Brooks v. Geraghty*, No. 288354, 2005 WL 767867, at *9 (Mass. Land Ct. Apr. 6, 2005).

*Id.*

The court concluded its examination by expressly holding that "if an easement is expressly created but never used, then use of the easement area is not adverse and will not trigger the statutorily-mandated period of time for adverse possession until the easement holder needs to use the easement." *Id.* This holding might appear to suggest that the focus of the inquiry be entirely on whether the dominant estate owner has ever sought to use the easement. *Accord id.* at 1274 ("[W]hether the *Castle Associates* rule applies to this case . . . depends upon whether the easement was expressly created and whether it has ever been used as a right-of-way."). The concurrence, however, suggests that the inconsistency and irreconcilability of the servient owner's use, with respect to the easement rights granted to the dominant estate, remain germane. *Id.* at 1275 (Eid., J., concurring).

Most jurisdictions to have considered, post-*Castle*, the issue of termination of easement rights by prescription in cases of nonuse have cited *Castle* approvingly and/or outright adopted it. The cases, *infra*, tend to focus on two different aspects of *Castle*; either emphasizing *Castle*'s demand requirement,

especially in factually similar cases, or determining whether the degree or character of the allegedly adverse use makes it actually adverse in light of nonuse by the dominant estate owner.

Where the alleged adverse use of the easement is perceived as akin to that of *Castle* (i.e., a fence), the focus tends toward application of *Castle*'s demand requirement. *See Vandeleigh Indus., Inc. v. Storage Partners of Kirkwood, LLC*, 901 A.2d 91, 105-06 (Del. 2006) (holding that use of an easement upon which a wall had been constructed, but was otherwise undeveloped, "will not be deemed adverse to the existence of the easement until such time as . . . the need for the right of way arises" (quoting *Castle*, 407 N.Y.S.2d at 723)); *Kolouch v. Kramer*, 813 P.2d 876, 879 (Idaho 1991) ("[W]here the easement was created, but no occasion has arisen for its use, the owner of the servient tenement may plant trees, erect a fence, etc. and such use will not be deemed to be adverse (or inconsistent . . .), until the need to use the easement arises . . . ."); *Halverson v. Turner*, 885 P.2d 1285, 1290 (Mont. 1994) (holding that a boundary fence is not an adverse use unless the dominant estate owner objects to such); *see also Matoush*, 177 P.3d at 1273.

But where the alleged adverse use is of a potentially more interfering nature, the focus centers on whether such use was inconsistent with the dominant estate owner's future interests. *See City of Edmonds v. Williams*, 774 P.2d 1241, 1243-44 (Wash. Ct. App. 1989) ("Nor is an easement lost by prescription during a period of nonuse, unless the adverse use is clearly inconsistent with the future use of the easement."); *Mueller*, 887 P.2d at 509 (citing *Castle* and related cases in holding no termination by prescription where the dominant estate owner's "use of the land was simply 'not inconsistent with the purpose reserved in the easement'" (quoting *Kolouch*, 813 P.2d at 880)).

Upon our review of these cases, we hold that *Castle*'s demand requirement plainly applies where the nature of the servient estate owner's use of the easement is a readily removed or dismantled impediment, obstruction, or such. We do not go so far as to say that the servient estate owner's use, no matter how

permanent, substantial, or detrimental to remove, will never be deemed adverse absent a demand to utilize the easement. In intermediate cases, remaining mindful of principles protective of equitable servitudes, *see, e.g.*, 28A C.J.S. *Easements* § 140 (2008) ("The forfeiture of easements is not favored . . . ."), we further hold that courts must determine whether the servient estate's use or improvement of an easement is so completely irreconcilable with the dominant estate's future interest in the easement that the prescriptive period is triggered.

In the case at hand, focusing, as the lower court did, on the time period commencing in 1940, we recite the following facts as found by the Circuit Court. "The Okayamas and/or their predecessors in interest constructed and utilized a *hoshidana* within the easement area, cultivated coffee [trees] and macadamia nut[] [trees] within the easement area, and constructed a rock wall across the right of way[.]" There is no evidence that Plaintiffs-Appellants, or their predecessors in interest, had ever utilized the 25' Right of Way.[15]

We find *Kolouch* particularly informative here. In *Kolouch*, the servient estate owner planted several trees down the center of the easement, erected a fence, constructed a concrete irrigation diversion, and placed several large boulders at one end of the easement. 813 P.2d at 878. The *Kolouch* court, in affirming the lower court's holding that these acts did not extinguish the easement, stated:

> Applied here, we may paraphrase [the *Castle*] rule to read that where the easement was created, but no occasion has arisen for its use, the owner of the servient tenement may plant trees, erect a fence, etc. and such use will not be deemed to be adverse (or inconsistent . . .), until the need to use the easement arises, etc. We think this rule makes sense in light of the well established rule that the owner of the servient estate is entitled to use his land, even though encumbered by an easement, for any purpose not inconsistent with the purpose reserved in the easement. Accordingly, Kramer's use of his property which was subject to the easement has not been adverse or inconsistent with the Kolouchs' rights prior to the time the Kolouchs' need to use the easement arose, and the trial court's finding to that effect was not clearly erroneous.

---

[15] Nor have we been directed to any evidence that, prior to the events precipitating the instant action, Plaintiffs-Appellants or their predecessors ever asserted their rights to use the 25' Right of Way.

813 P.2d at 879-80. *Kolouch*'s holding has been cited approvingly in several jurisdictions. *See Sabino Town & Country Estates Ass'n v. Carr*, 920 P.2d 26, 30 (Ariz. Ct. App. 1996); *Vandeleigh Indus.*, 901 A.2d at 105; *Mueller*, 887 P.2d at 509.

Applying *Kolouch* here, neither the planting of trees nor establishment or maintenance of the rock wall constitutes adverse use where Plaintiffs-Appellants' predecessors had never sought to use the 25' Right of Way. 813 P.2d at 879-80; *see also Smith*, 932 A.2d at 393 ("[C]ourts routinely reject that vegetation on an easement, both cultivated and natural, constitutes adverse use adequate to extinguish the easement."). What remains undetermined is whether the construction or existence of the *hoshidana*, either considered alone or together with the trees and rock wall, was of such a nature as to be irreconcilable with Plaintiffs-Appellants' predecessors' future interests in utilizing the 25' Right of Way.

Based on the evidence in the record, the competing motions for summary judgment and the associated principle that we construe evidence favorably and draw inferences for the non-moving party, we cannot conclude that such use of the land was, or was not, so irreconcilable with the ability of Plaintiffs-Appellants' predecessors to utilize the 25' Right of Way. Therefore, this remains a genuine issue of material fact, and the Circuit Court erred by granting summary judgment for the Okayamas on the issue of termination by prescription.

c. Troxel's claim to an implied easement

We agree with the Circuit Court that there is no evidence that would support a finding of an implied reservation of an easement over Parcel 29 in favor of Troxel. Plaintiffs-Appellants' argument to the contrary fails because Troxel has an express grant of right to use Easement 3.[16/] *Achi v. Poni*, 5 Haw. 176 (Haw. Kingdom 1884), and its supposition of an implied easement apply only insofar as there exists a necessity to imply

_____

[16/] Troxel's deed asserts his right to use Easement 3, and despite the lack of any reference to such right in the Haradas' certificate of title, the Haradas concede his right. Neither the Okayamas nor Plaintiffs-Appellants dispute Troxel's express right to Easement 3.

such an easement. *Achi*, 5 Haw. at 177 ("The law presumes a right of way reserved, or rather gives a new way from the necessity of the case, and the new right of way ceases with the necessity for it.").

We further agree with the Circuit Court that Troxel, having failed to plead a cause of action based upon the doctrine of implied easement, cannot now assert such a claim. *See In re Genesys Data Techs., Inc.*, 95 Hawai'i 33, 41, 18 P.3d 895, 903 (2001) ("Hawaii's rules of notice pleading require that a complaint set forth a short and plain statement of the claim that provides defendant with fair notice of what the plaintiff's claim is and the grounds upon which the claim rests." (citing Haw. R. Civ. P. Rule 8(a) (1999))). Nor was the inverse of the claim (that Troxel had no implied easement) placed in issue by the Okayamas' Counterclaim which sought a declaration that their land was unemcumbered by any easements benefitting Parcels 6 (Childs) and 8 (Wilson). The Okayamas, therefore, were likewise barred from asserting in their motion for summary judgment that Troxel had no implied easement.

d. The Okayamas' remaining defenses

Plaintiffs-Appellants contend that summary judgment should have been granted in their favor regarding the Okayamas' other defenses: laches, equitable estoppel, and bona fide purchasers without notice. The Circuit Court, however, expressly declined to rule on whether summary judgment was appropriate. Because we vacate the Circuit Court's judgment as to its grant of summary judgment for the Okayamas and remand for further proceedings, we leave it to the Circuit Court to address these additional defenses in the first instance. *See AFL Hotel & Rest. Workers Health & Welfare Trust Fund v. Bosque*, 110 Hawai'i 318, 327, 132 P.3d 1229, 1238 (2006) ("This court has long held to the general rule that questions 'not . . . ruled upon by the trial judge will not be considered and passed upon for the first time on appeal.'" (quoting *State v. Cummings*, 49 Haw. 522, 527, 423 P.2d 438, 442 (1967))).

e.    Plaintiffs-Appellants' remaining claims

Based on our disposition of Plaintiffs-Appellants' and the Okayamas' claims on appeal as to each other, we leave it to the Circuit Court to address the scope of permissible use of the 25' Right of Way and whether a prohibitory injunction against the Okayamas is warranted.

B.    Plaintiffs-Appellants' Appeal as to the Haradas and the Haradas' Cross-Appeal

Plaintiffs-Appellants argue for an interpretation of the land court's original decree and certificate of title as establishing a public easement by way of Easement 3, based on references in the Application to a set of "public ways running through the land." The Haradas contend, however, that the Circuit Court lacked jurisdiction to hear Plaintiffs-Appellants' claims for declaratory and injunctive relief regarding their rights as to Easement 3. They argue that Plaintiffs-Appellants sought, in effect, to register a public easement, and that because the Haradas' land had been registered in land court, Plaintiffs-Appellants' claims could only have been properly brought in land court. They further argue that the public ways referenced in the Application were roads other than Easement 3.

In considering the claim, we begin by examining the law specifying the land court's jurisdiction:

> A court is established, called the land court, which shall have *exclusive original jurisdiction of all applications for the registration of title to land and easements or rights in land* held and possessed in fee simple within the State, with power to hear and determine all questions arising upon such applications, *and also have jurisdiction over such other questions as may come before it under this chapter*, subject to the rights of appeal under this chapter. The proceedings upon the applications shall be proceedings in rem against the land, and the decrees shall operate directly on the land and vest and establish title thereto.

HAW. REV. STAT. § 501-1 (1993) (emphasis added). Under HRS § 501-1, the land court has (1) exclusive original jurisdiction over applications for registration of land, and (2) concurrent jurisdiction over issues brought pursuant to chapter 501 that arise after the initial registration of land in land court. *Iaea v. Iaea*, 59 Haw. 648, 650, 586 P.2d 1015, 1017 (1978) ("The

28

circuit court had jurisdiction [to determine a forgery], despite the fact that it concerned registered land."); *Waimea Falls Park, Inc. v. Brown*, 6 Haw. App. 83, 85 n.5, 712 P.2d 1136, 1138 n.5 (1985) ("[HRS] chapter 501 does not contemplate that, after registration, every controversy involving registered land must be decided by the land court. . . . We find nothing in the statutes or our case law indicating that the land court has exclusive jurisdiction over matters affecting registered land."); *see also In re Estate of Damon*, 5 Haw. App. 304, 310 n.2, 689 P.2d 204, 208 n.2 (1984) (suggesting that while having jurisdiction, the land court might nevertheless elect to forego its jurisdiction in favor of that of the Circuit Court regarding more complex matters). *But see Dudoit v. Clifton*, 114 Hawai'i 175, 179-80, 158 P.3d 293, 297-98 (App. 2006) (asserting, in dicta, that questions regarding removal of portions of a rock wall separating two land court properties were "not questions presented or presentable . . . . [T]hese questions must be presented to and answered by the land court."). In this case, the Plaintiffs-Appellants do not seek to register title to land or to the easement; rather, they seek to determine the proper scope of Easement 3.

In *Knauer v. Foote*, 101 Hawai'i 81, 63 P.3d 389 (2003), the supreme court held, in accordance with HRS § 501-151, that the circuit court had jurisdiction to expunge a lis pendens that had been filed in the land court. In reaching that conclusion, the supreme court overruled *In re 2003 and 2007 Ala Wai Blvd., City & Cnty. of Honolulu*, 85 Hawai'i 398, 944 P.2d 1341 (App. 1997) ("*Ala Wai Blvd.*").

In *Ala Wai Blvd.*, this court had determined that the circuit court did not have jurisdiction to expunge a lis pendens from land court property because HRS § 501-196,[17] which expresses

---

[17]    HRS § 501-196 provides in part:

> No erasure, alteration, or amendment shall be made upon the registration book after the entry of a certificate of title or of a memorandum thereon, and the approval of the same by the registrar or an assistant registrar, provided that the registrar or assistant registrar may correct any clerical error made by personnel of the registrar's or assistant
> 
> (continued...)

the requirements for amending a certificate of title, provides the land court with exclusive jurisdiction to amend the certificate of title. In overruling the case, the supreme court did not determine that the land court had exclusive jurisdiction over the amendment of certificates of title. *Knauer*, 101 Hawai'i at 87, 63 P.3d at 395. Rather, the court concluded that, because the expungement of a lis pendens did not alter or amend the certificate, HRS § 501-196 was inapplicable to the analysis.[18/] *Id.* From there, the court concluded that the circuit court had jurisdiction to expunge the lis pendens under HRS §§ 501-151 and 501-152. *Id.* at 88, 63 P.3d at 396.

Accordingly, regardless of whether the land court enjoys exclusive jurisdiction over amendments or alterations to a certificate of title, the circuit court has concurrent jurisdiction under HRS § 501-1 to determine matters regarding title to land court property as recognized by *Iaea*. As such, the Circuit Court had jurisdiction in this case to determine the scope of Easement 3,[19/] but did not have jurisdiction to order an amendment to the Haradas' and Toki's certificates of title.

---

[17/] (...continued)

> registrar's office. Any registered owner or other person in interest may at any time apply by petition to the court, upon the ground that registered interests of any description, whether vested, contingent, expectant, or inchoate have terminated and ceased; or that new interests have arisen or been created which do not appear upon the certificate[.]

HAW. REV. STAT. § 501-196 (2006).

[18/]     In *Knauer*, the supreme court questioned the continued validity of *Iaea*, 59 Haw. 648, 586 P.2d 1015, where the court had affirmed the circuit court's determination that a deed had been forged, but reversed the circuit court's order directing the land court to expunge the deed and certificate of title. *Knauer*, 101 Hawai'i at 87-88 & n.13, 63 P.3d at 394-95 & n.13. According to *Knauer*, "*Iaea* stands for the narrow proposition that the circuit court had jurisdiction to hear the subject matter of the dispute, i.e., the validity of a signature on a deed, but that it did not have the jurisdiction to order the land court to expunge the deed upon a finding that the signature was forged." *Id.* at 86, 63 P.3d at 394. We read the criticism included in Knauer's footnote 13 as questioning whether HRS § 501-196, as this court held in *Ala Wai Blvd.*, actually granted the land court exclusive jurisdiction over matters which may demand an amendment to or alteration of a certificate of title. As it stands, however, *Iaea* remains good law.

[19/]     Consequently, the Haradas' argument that the Circuit Court lacked jurisdiction to grant the TRO Motion or to enter its Preliminary Injunction Order fails.

Jurisdiction notwithstanding, the Circuit Court erred in resolving the dispute over the scope of Easement 3 on summary judgment because there were disputed issues of fact. Specifically, the disputed issue of fact is the scope of the ambiguous easement, i.e., whether it is a public road easement as contended by Plaintiffs-Appellants, an easement only for the benefit of Parcels 31 and 32 as contended by the Haradas, or a limited use easement as found by the Circuit Court. The scope of the easement, in turn, depends on the intent of the Church in establishing the easement when it sought to register Parcels 31 and 32. Whether Easement 3 is a public road easement may also depend on whether it coincides with the location of one of the "public ways" identified by the Church in its land court application.[20]

The Circuit Court found that the land court decree was ambiguous with respect to the scope of Easement 3, and thus considered parol evidence. Once the court found the decree ambiguous, however, it could not determine the scope of the easement as a matter of law. Rather, the scope of the easement and the intent of the party creating the easement became questions of fact. Here, the Circuit Court considered conflicting evidence regarding the intended scope of the easement in rendering its decision. Consistent with our analysis above regarding the 25' Right of Way, once the Circuit Court evaluated and drew inferences from predicate facts to determine the essential fact at issue, it exceeded its role in adjudicating the motions for summary judgment and partial summary judgment.

V.   CONCLUSION

We vacate all of the June 16, 2008 "Findings of Fact, Conclusions of Law, and Order Granting Defendants Okayama[s'] Motion for Summary Judgment Filed on 2/25/08," except for that part denying claims and defenses as to Troxel's purported implied

---

[20] The land court, despite the applicant's request to have these public ways sited, did not do so in the Decree. Nothing, however, prevents the Circuit Court from locating the public highways on remand. *See Ward v. City and Cnty. of Honolulu*, 31 Haw. 787, 789 (1931) ([I]f there is a highway running over registered land, the existence of the highway may be proven . . . ."). *See generally* HAW. REV. STAT. § 501-82(a)(4) (2006).

easement; the March 16, 2009 "Finding[s] of Fact, Conclusions of Law and Order Granting Plaintiffs' Motion for Partial Summary Judgment Against [the Haradas], Filed on February 21, 2008 and Granting Plaintiffs' Motion for Entry of Default Judgment on Ethel Nobuki Toki on All Counts of the Complaint Filed, February 21, 2008" in its entirety; and the July 3, 2008 "Clerk's Taxation of Costs in Favor of Defendants [the Okayamas]". Accordingly, we vacate the June 25, 2009 "Final Judgment as to All Claims and All Parties," except for paragraph (3) which granted the Haradas' motion to amend the caption. This case is remanded to the Circuit Court of the Third Circuit for proceedings not inconsistent with this opinion.

On the briefs:

R. Laree McGuire and
S.V. (Bud) Quitiquit
(Porter Tom Quitiquit
Chee & Watts, LLP)
for Plaintiffs-Appellants/
Cross-Appellees

Paul K. Hamano
for Defendants-Appellees/
Cross-Appellants
Alan J. Harada, Co-Trustee under
that certain Trust made by
Junichiro Harada dated April 21, 1981,
Mikie Harada, Alan J. Harada, and
Sharon S. Harada

Michael W. Moore
(Law Offices of Yeh & Moore)
for Defendants-Appellees
Jack Hideto Okayama, Wallace
Sadao Okayama, and Hatsune O.
Hirano